Prentice Unemployment Compensation Case.

Prentice, Appellant, *v.* Unemployment Compensation Board of Review et al.

Argued October 7, 1947. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and FINE, JJ.

*Jesse P. Long,* with him *Samuel Krimsly, Joseph M. Loughran, Anthony Cavalcante* and *James Hall Prothero,* for appellant.

*Richard H. Wagner,* with him *T. McKeen Chidsey,* Attorney General, *R. Carlyle Fee,* Assistant Special

Deputy Attorney General and *Charles R. Davis*, Special Deputy Attorney General, for appellee.

*Frank G. Smith*, with him *Robert V. Maine, Frank A. Whitsett, H. Vernon Fritchman* and *Smith & Maine*, for intervenor, appellee.

OPINION BY DITHRICH, J., January 8, 1948:

This is an appeal from a decision of the Unemployment Compensation Board of Review (hereinafter referred to as the Board), affirming the decision of the Bureau of Employment and Unemployment Compensation (hereinafter referred to as the Bureau), denying the claimant unemployment compensation.

It grows out of a work stoppage in the bituminous coal industry during the so-called "Supervisors' Strike" which extended from on or about September 22 to October 22, 1945. It is estimated that approximately 50,000 rank and file miners became unemployed due to the strike and either filed claims or were considered potential claimants for unemployment compensation.

The various claimants were employed at approximately 125 different mines or places of employment operated by approximately 63 employers. It is acknowledged by all parties that there was an industrial dispute between the United Clerical, Technical and Supervisory Employees Union (hereinafter called the UCT) and the coal operators. It is also acknowledged that the suspension of work by the supervisory employees developed when, following the refusal of the Jones and Laughlin Steel Corporation (hereinafter referred to as J. & L.) and other coal operators to recognize the UCT as their collective bargaining agent, supervisors in the employ of J. & L. voted to go out on strike as a means of enforcing their demand. Supervisory employees at other mines in the bituminous area then went out on strike in sympathy with the employees at the J. & L. mines. The coal operators were forced to shut down

their mines because, due to the strike of the assistant foremen and fire bosses, the mines could not be fire-inspected, as required by the Bituminous Mine Code, and as a result of this suspension the rank and file miners became unemployed. They remained unemployed until they were ordered back to work by John L. Lewis, President of the United Mine Workers of America (hereinafter referred to as the UMW). The Board in its decision states:

"The case of a single claimant has been selected for procedural reasons, viz., to simplify further appellate proceedings which are anticipated. However, while actually deciding only one claim, we include for the purpose of review the basic facts of the entire controversy as it affected all the claims before the Board. We have pursued this course for the following reasons. Obviously the important question for determination is not the rights of a single claimant or employer, or even all the appellants now before the Board, . . . Ultimately at stake is the contested right of some 50,000 employes to receive, and the Commonwealth's liability to pay, benefits for a period of four weeks. Contingent upon this determination also is the effect which the payment of benefits may have on the employers' contribution rate under the merit rating provisions of the Law. For, even though each and every one of the individual appeals before the Board were decided, the Bureau's responsibility would only then commence with respect to the thousands of other miners, potential claimants for an aggregate sum of approximately $4,000,000. . . .

"We have selected the claim of James Prentice for determination because he is a member of that group of claimants (see Group (d), Finding No. 14) as to whom there is the least indication of personal participation in the strike. The claimants in this group, as hereinafter stated, reported for work on the day the strike commenced and were told by management to go home be-

cause the mines could not be operated. . . . The specific case of James Prentice has been chosen because counsel and witnesses were present at the Referee's hearing, with the result that a better than average record was developed. Furthermore, because of the special efforts which the parties made to 'fix the blame for the miners' unemployment', we believe that this record better than any other reveals the true circumstances in which the parties generally found themselves during the strike."

The claimant, James Prentice, was employed as a coal loader at Yatesboro #5 mine of the Rochester and Pittsburgh Coal Company at Nu Mine in Armstrong County. He is president of the local union of the UMW. He worked on September 23 but did not work thereafter until October 22.

The issue thus being essentially one of fact and not of law, arising out of a situation which involves a voluminous record, the facts so far as essential to a determination of the issue may be briefly culled from the "Findings of Fact" by the Board:

"1. The circumstances which finally culminated in the unemployment of the miners arose out of a suspension of work by supervisory employes throughout the bituminous coal area. . . .

"2. As to the background of the controversy, the following appears: . . . Sometime in 1942 the Mine Officials Union petitioned the UMWA for admittance and, on February 5, 1943, after the passage of an amendment to the Constitution of the UMWA . . . authorizing its admittance, the petition was finally accepted, to become effective March 31, 1943.

"3. On February 20, 1943, the UMWA issued a letter of instruction to all district and local officers setting forth the manner in which supervisory employes were to be granted membership in the union. This letter stated [inter alia]:

" 'a. Between this date and March 31, 1943, each mine foreman, assistant mine foreman, dock boss, night boss, fire boss, mine examiner, watchman, coal inspector, mine clerk and all other employes heretofore exempted from membership shall be presented application blanks for membership in the UMWA and requested to join this Union.

" 'b. When such petitions for membership are signed, they shall be held by the Local Union until the first day of April, 1943, at which time a special meeting of the Local Union can be called. Signers of the petitions accepted shall be given the obligation and inducted into membership in the UMWA.'

"The letter further states:

" 'The officers of each Local Union are requested to give their full consideration and coöperation in the execution of this policy and under no circumstances should the instructions contained in this letter fail to receive their immediate and constant attention until the task herein outlined is completed.' "

Following unsuccessful efforts on the part of the international executive board of the UMW during 1943 and 1944 to have the operators recognize the Mine Officials Union, sometime in 1945,

"7. . . . the president of the UMWA stated in a message to an operator;

" 'I acknowledge your wire in reference to several idle mines. This office is advised that the officers of District 5 are doing everything possible to correct the situation and insure continuance of operation. I call your attention to the fact that the present unrest in the District over the question involved in this strike have been super-induced by the negligent and arrogant attitude of the operators' representatives in your Association in refusing over a period of years to coöperate with the UMWA in the adjustment of the mine foremen and supervisors question.'

"8. The UCT is a division of District No. 50 of the UMWA, . . . District No. 50 is the organization com-

monly called the 'catch all' district of the UMWA and includes construction workers, building trades, and other employes. . . . The miners' locals and the UCT locals each have their own officers; they meet separately, and to date the UCT locals have not admitted rank and file miners to membership nor have rank and file locals admitted supervisory, clerical and technical personnel to membership. Upon joining their respective locals both miners and supervisors take the same oath and obligation.

"9. The UCT has no separate Constitution apart from that of the UMWA, no separate charter or by-laws, no separate rules or regulations. Local unions of the UCT are issued a charter by the UCT and have local by-laws which must not be in conflict with the UMWA Constitution, or the UMWA Rules and Regulations. . . . Dues from the local UCT union are forwarded to the UCT officials in Pittsburgh where they are divided. Part is returned to the locals, part is retained, and the greatest portion is sent to the International Union of the UMWA. . . .

"10. . . . The President and Secretary-Treasurer of the UCT, . . . the only full-time officials, were not elected by the UCT members but were appointed by the International Officers of the UMWA. . . . The salaries of these officials are paid by the International Union of the UMWA. Their salaries and expenses are included in the semi-annual reports of the International Secretary-Treasurer and the International Auditors of the UMWA, where these individuals are listed among the officers and employes of the UMWA.

"(The facts contained in the Findings #1 to #10 inclusive, were made the subject of a stipulation.)"

"The board's findings of fact, when supported by evidence, are conclusive upon appeal, which is confined to questions of law": *MacFarland v. Unemployment Compensation Board*, 158 Pa. Superior Ct. 418, 420, 45 A. 2d 423.

The Board in its decision states:

"After considering the organizational relationship between the UMWA and the UCT, together with the provisions of the UMWA constitution, it seems evident that the officers of the UMWA had the power to prohibit the strike. . . .

"It remains . . . to be determined whether or not the officers of the international organization of the UMWA took any steps to prevent the strike . . . there [is no] evidence that the officers of the UMWA took any measures to halt the strike until October 19th when the President of the UMWA and the President of the UCT directed their members to return to work. On the contrary, it must be inferred [as a fact] that the strike met with the actual approval of the UMWA."

The Board decided "that the strike by the members of the UCT not only was within the control of the officers of the UMWA, but that it was approved by the international organization of the UMWA" and "Since the . . . UMWA approved and supported the strike by the supervisors, the immediate consequence of which was to throw the rank and file miners out of work, the members of the UMWA must be deemed to have assented to the strike and the suspension of work must be considered voluntary on their part."

The Bureau based its decision on the theory that any employee is temporarily disqualified if his unemployment is "due to a strike in the establishment where he works," irrespective of the claimant's participation in the strike and regardless of whether or not his employment is voluntary on his part, a construction still contended for by the operators. There is much to be said in favor of such a construction. Section 402 (d) of the Unemployment Compensation Law of December 5, 1936, P. L. (1937) 2897, as amended, 43 PS §802, provides in part that an employee shall be ineligible for compensation for any week "In which his unemployment is due to a voluntary suspension of work resulting from

an industrial dispute, at the factory establishment or other premises at which he is or was last employed." Cf. *Baker v. Powhatan Mining Co.*, 146 Ohio State 600, 67 N. E. 2d 714. The Ohio Statute provides in part that "No benefits shall be payable to any individual who has lost his employment or has left his employment by reason of strike in the establishment in which he was employed."

But in our opinion the Board was on more reasonable ground than the Bureau when it based its decision on the fact that ". . . the officers of the UMWA, in supporting the position of the supervisors and in approving the strike, acted as agents for the members of the UMWA." The soundness of this reasoning cannot be effectively questioned. Not only is it supported by the principle that a member of a union designates his union representatives to act for him as his agents in all matters pertaining to his employment, such as collective bargaining, but also on the principle that a person cannot claim the advantages of his voluntary acts, in this case joining the union, without at the same time assuming responsibility for their natural and probable consequences. As stated in *Department of Industrial Relations v. Pesnell*, 29 Ala. App. Reports 528, 199 So. 720 (certiorari denied by Alabama Supreme Court, *Ex parte Pesnell*, 240 Ala. 457, 199 So. 726):

"The appellee's situation was created by his duly selected bargaining agents. Their acts were his acts. It would be difficult for us to reach the conclusion that the appellee [claimant] could, under the law, bring about a cessation of work and then claim he was unemployed within the terms of the Unemployment Insurance Act." Quoted with approval in *Baker v. Powhatan Mining Co.*, supra. See also decision of the Circuit Court of Allegany County, Maryland, 4 C. C. H. 23546, 23550.

True, the principles of the law of agency have not heretofore been applied to any case arising under the Pennsylvania Statute, but that is merely because the

facts in the earlier reported cases do not call for their application. But here the significant facts are the authorization of his agents by claimant and his acquiescence in the conditions imposed by them which prevented him from remaining at work. He knew, or must be presumed to have known, that his return to work had been conditioned by his agents upon the recognition of his union, the UMW, as the bargaining agent for the UCT, on an industry-wide basis. Not only did he acquiesce in failing to object to his union's action, but also by remaining away from work until notified by the president of his international union to return. "Acquiescence by the principal in conduct of an agent whose previously conferred authorization reasonably might include it, indicates that the conduct was authorized; if clearly not included in the authorization, acquiescence in it indicates affirmance": Section 43, Restatement, Agency.

That the Board was warranted in finding that the officers of the UMW had the power to prohibit the strike and in concluding that by failing so to do, they in effect sanctioned and supported it, is abundantly clear from the evidence. Article XVI, section 1 of the UMW constitution provides that "No district shall be permitted to engage in a strike involving all or a major portion of its members, without the sanction of an International Convention or the International Executive Board." Between international conventions, "the supreme executive and judicial powers" of the union are vested in the executive officers and the executive board. The constitution further provides that "The International Union shall have supreme legislative, executive and judicial authority over all members and subordinate branches, and shall be the ultimate tribunal to which all matters of importance to the welfare of the membership and subordinate branches shall be referred . . ."

By delegating authority to his union officials to act for him lawfully within the scope of the union's objec-

tives, claimant clearly made them his agents. By making them his agents he shared in the responsibility for the strike, which brought about his unemployment, thereby rendering it voluntary within the meaning of Section 402 (d), supra. Notwithstanding his personal willingness to work and the fact that he would have done so had work been available, his unemployment was voluntary because he voluntarily joined the union and adhered to its principles and obeyed the orders of its officials. As said in *Barclay White Co.* v. *Unemployment Compensation Board,* 356 Pa. 43, 50, 50 A. 2d 336:

"By what stretch of the imagination could it be said that such a person is *involuntarily* unemployed? Claimant entered into membership in his union *of his own volition* because he felt that his best financial interests would be served thereby. . . . No one can properly question the fact that a worker who joins a union and abides by its lawful rules, regulations and by-laws is within his legal rights. . . . The public policy of the Commonwealth does encourage membership in labor organizations but retention of membership therein is not a surrender to circumstances of the kind and quality which will turn voluntary unemployment into involuntary unemployment."

Claimant "of his own volition" dealt with his employer collectively through his union agents. Full responsibility and authority for fixing the terms and conditions of his employment were delegated to them. No reasonable person in the present day and age would question his right of collective bargaining, a right which has come to be almost universally recognized. But he cannot delegate to others a responsibility he owes to the Unemployment Compensation Fund to pursue a standard of conduct manifesting his desire to work during the period for which he claims benefits. And his responsibility to the fund has not been met when the course of conduct of his union officials has not been

consistent with his remaining employed. Claimant's unemployment was brought about as a direct result of his own chosen method of collective bargaining. No matter how wisely he may have chosen his bargaining agents, and no matter how dutifully they may have acted in his behalf, their acts were his acts, binding upon his union and binding upon him. To hold otherwise would be to ignore the way in which trade unions function through their international officers.

"We think it pertinent to say here that we are in no way interfering with the practice and procedure of collective bargaining or with a worker's full freedom of association with his fellows in a labor or other lawful organization. Such considerations have no place here. We are called upon to decide merely whether or not under the facts presented claimant is eligible for compensation under the Unemployment Compensation Law": *Barclay White Co.* v. *Unemployment Compensation Board,* supra, page 49.

Whether or not the recognition of the UCT by the coal operators would benefit the rank and file miners of the UMW is beside the point. The point is that their international officers considered it of distinct advantage to the UMW, and that the rank and file miners, in acquiescing in the suspension of work which their representatives obviously approved for their ultimate benefit, thereby became voluntarily unemployed.

We agree with the conclusion of the Board that ". . . because of his membership in the union which approved and controlled the strike, the suspension of work which caused his [claimant's] unemployment must be deemed to have been voluntary on his part with the result that his claims are subject to the disqualification provided in Section 402 (d) of the Unemployment Compensation Law."

Decision affirmed.