**WILLIAMS et al. v. YELLOW CAB CO. OF PITTSBURGH et al.**

Civ. No. 9266.

United States District Court
W. D. Pennsylvania.

March 3, 1952.

Hymen Schlesinger, Arthur D. Stevenson, Pittsburgh, Pa., for plaintiffs.

H. A. Robinson and Daniel S. Newman (of Dickie, McCamey, Chilcote, Reif & Robinson), Pittsburgh, Pa., for defendants Yellow Cab Co. and George Schratz.

Ben Paul Jubelirer, Pittsburgh, Pa., for remaining defendants.

MARSH, District Judge.

This action is brought by plaintiffs on their own behalf and as a class action on behalf of all the Negro drivers employed by the defendant Yellow Cab Company of Pittsburgh, Pennsylvania (hereinafter called Company). The complaint alleges that the defendants have entered into a conspiracy to discriminate against plaintiffs and segregate them because of their race.[1]

Plaintiffs request, inter alia:

"a. * * * a declaratory judgment and order defining and declaring the rights of the plaintiffs under the law and the Contract aforesaid and that the said working regulations be declared illegal and void and the said discriminatory practices recited herein be declared illegal.

"b. For a temporary or interlocutory injunction to be made final and permanent after hearing, enjoining and restraining the continuance of the illegal practices and the deprivation of the constitutional and civil

1. Plaintiffs specifically object to the current Working Regulations (adopted July 30, 1949) promulgated by the Company and approved by the Union and some of the Negro drivers. These Regulations provide:

"At a meeting held at the offices of the Yellow Cab company this date between the Management, the Union and the Committee representing the drivers of the Uptown Garage the following changes in the regulation covering the operation of this garage were approved [sic].

"No. 1—An uptown driver may pull into all railroad stations or any stands where there are no cabs and loads are waiting and take a load.

"No. 2—all uptown drivers are permitted to O.K. in certain outlaying dis-[trict]s and get a trip if no trip is available they are to vacate the stand immediately, this applies to the following stands — 41 — 47 — 65 — 73 — 78 — 79 — 122 — 131 — 154 — 156 — 157 — 158 —169—170—also York Club and the E. L. Elks—at Renfrew and Lincoln Avenue. But will not O. K. at any other stand.

"No. 3—an Uptown driver when discharging a load outside the third and fifth wards shall return to those wards directly however if they are in the process of returning and they are hailed while outside their wards they may accept the trip regardless of the destination.

"No. 4—any driver or drivers heckling —cat calling or becoming a nuisance in general to other drivers of this company while they are properly conducting their business shall be subjected to discipline upon being reported by any driver—official of the union or representative of the company and found guilty.

"No. 5—Cruising is prohibited and in no case will any uptown driver traverse the city or cruise for a pickup—downtown, North side or east Liberty or any other city district—those who cruise will be called to their office and those who violate will be subjected to discipline, if they do not have a valid excuse for doing same.

"No. 6—If any changes in these regulations they will be posted on the Bulletin boards of all garages, in order to familiarize all drivers with such changes.

* * * * * *

"July 30, 1949

"At a meeting held at the offices of the Yellow Cab Company, this date between Management—the Union and a committee representing the drivers of the Uptown Garage it was further affirmed that as the original working conditions under which the Uptown drivers are hired are still in effect specifically stated here as; THE DRIVERS OF THE UPTOWN GARAGE WERE HIRED FOR THE EXPRESS PURPOSE OF SERVING THE THIRD AND FIFTH WARDS AS NEAR TO A 100% AS POSSIBLE AND WHENEVER POSSIBLE ARE TO RETURN TO THIS DISTRICT AFTER EACH TRIP.

"It is further agreed that at the request of the committee members whose signatures appear below that this specific working condition be posted only in the Uptown Unit [sic]".

rights of the plaintiffs and all other members of their class.

\* \* \* \* \* \*

"f. For damages as each of the plaintiffs or any other member of the class may establish upon proper hearing of this case."

Defendants filed motions to dismiss the complaint for want of jurisdiction. After due consideration the court is of the opinion that the motions to dismiss should be granted.

Plaintiffs set forth the following jurisdictional allegations:

1. 28 U.S.C.A. § 1331 which states that "The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $3,000, exclusive of interest and costs, and arises under the Constitution, laws or treaties of the United States."

2. 28 U.S.C.A. § 1343, which is known as the Civil Rights Act, and which states that "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: \* \* \* (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

3. 29 U.S.C.A. § 151 et seq., which is the National Labor Relations Act and which at Section 159(a) states that "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: \* \* \*."

Plaintiffs contend that the right of Taxicab Drivers Local No. 128 (hereinafter called Union) to bargain collectively for all of the employees of the Company was derived from the National Labor Relations Act; or if the court should find that the Company is not engaged in a business affecting interstate commerce so that the N.L.R.A. does not apply, then the right is derived from the Pennsylvania Labor Relations Act, Act of June 1, 1937, P.L. 1168, 43 Pa.Purdon's Supp. 211.1 et seq. They then urge that since the right to act as exclusive collective bargaining agent is derived from either of these two acts the Union is bound to the corollary duty to bargain in good faith and without discrimination. In support of this contention they cite Steele v. Louisville & Nashville Railroad Co., 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173, and Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, 1944, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187. See also Graham v. Brotherhood of Locomotive Firemen & Enginemen, 1949, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22. In the Steele case, the Supreme Court of the United States held that the union, which did not admit Negroes to membership, derived its power to bargain for nonmembers of the union by virtue of the Railway Labor Act. The Court held that since the right was derived from that Act the corollary duty arose to bargain for the nonmembers in good faith and without discrimination. The deciding issue in the instant case on the question of jurisdiction, therefore, is whether the Union is acting as the statutory representative of the plaintiffs, and is governed by the rule in the Steele case, or whether it is acting solely as a private contracting party. If the latter, the court does not have jurisdiction.

In the Steele case [323 U.S. 192, 65 S.Ct. 230], the Supreme Court stated that since "petitioner and the other Negro members of the craft are not members of the Brotherhood or eligible for membership, the authority to act for them is derived *not from* their action or consent but *wholly from the command of the Act.*" (Emphasis added). In the case sub judice, however, the Union not only admits plaintiffs to membership, but under the collective bargaining agreement with the Company they are required to become members of the Union. This Agreement, dated May 1, 1950, provides that "all drivers of the taxicabs owned or operated by it shall be members of the Union, who are in good standing and

continue to remain in good standing and whose dues have been fully paid to and including the previous month." [2]

Plaintiffs in their complaint, paragraphs 7 and 8, aver and lead us to believe that all Negro employees are members of the Union and are entitled to the same rights as white members. They now, however, contend that six[3] Negro drivers were never sworn in, and therefore, they are not members of the Union.

It was stipulated that these men signed applications for membership cards and checkoff forms authorizing the deduction of the initiation fee of $25; the deduction of monthly dues of $2.25, and the deduction of any fines, penalties or assessments.

Charles Weber, business agent and secretary of Local Union No. 128, testified that the deductions were made by the Company as authorized and in accordance with the Agreement between the Company and Union. Thus, it appears that except for the formalities with which these men failed to comply, they were, to all intents and purposes, members of the Union.[4] Certainly the Union, which has accepted the initiation fees and monthly dues, would be estopped to deny that these men are Union members. For the six men to deny membership in the Union would be tantamount to requesting their own dismissal, in view of the Union Shop Agreement.

 To hold that the Union in this case was acting under authority of the National or Pennsylvania Labor Relations Acts would be to hold that the common law right to contract between employer and employee has been completely eliminated by the passage of these Acts. We do not believe that to have been the intent of

Congress or the State Legislature. The declared purpose of this field of legislation is to encourage collective bargaining procedure, but where, as in the instant case, the employer and union voluntarily enter into collective bargaining agreements; continue to bargain collectively for approximately fifteen years, and each employee is required by virtue of the collective bargaining agreement to become a member of the union, thus appointing the union to be his exclusive agent for collective bargaining purposes,[5] there is no foundation for the conclusion that the Union is acting under authority or rights granted by either of the labor acts. Conversely, the employees are not deprived of their right to bargain on their own behalf by virtue of the labor acts. They voluntarily gave up that right to the Union as a condition of employment and that condition is imposed by the terms of the Company-Union Agreement.

 This conclusion is further fortified by the fact that under the N.L.R.A. certain conditions must be met before the Board may take jurisdiction of a labor dispute.[6] Thus, it seems logical that a union cannot be held to receive rights under the Act until it has complied with the conditions precedent necessary to enforce the rights secured by the Act.

 The State Act was approved on June 1, 1937. The first agreement recognizing the Union as bargaining agent was entered into on February 6 or 10, 1937.[7] There is no question that the parties to the agreement at that time entered into a valid private contract and that the enactment of the State Labor Act did not confer additional rights on the Union. After the passage of the Act, if the Company refused

---

2. Defendants' Agreement between the Company and Union entered into August 18, 1947, contains substantially the same provision.

3. One of the drivers, Luther Harshaw, signed the obligation prescribed by the Union as prerequisite for formal admission to membership in the Union.

4. See Lebanon Steel Foundry v. National Labor Relations Board, 1942, 76 U.S. App.D.C. 100, 130 F.2d 404, 408, cert.

denied 317 U.S. 659, 63 S.Ct. 58, 87 L. Ed. 530, where it was held that signing membership applications and checkoff forms constitutes authorization to the union to bargain collectively.

5. See Prentice v. Unemployment Compensation Board of Review, 1948, 161 Pa. Super. 630, 56 A.2d 295.

6. 29 U.S.C.A. § 159(f) (g) (h).

7. See the answer to plaintiffs' interrogatories No. 9.

to recognize the Union as the bargaining agent, and the Union, invoking the Act, compelled it to do so, the resulting agreement would then owe its existence to the Act and not to private contractual rights voluntarily exercised. Where the employer enters into a contract voluntarily and bargains with the union, no additional right is shown to have been invoked which would warrant the conclusion that such a contract is by virtue of state or federal legislation.[8] The latter contract does not owe its existence to the Act but rather to private contractual rights.

Since we are of the opinion that neither the N.L.R.A. nor the Pennsylvania L.R.A. is applicable to the facts of this case, we do not find it necessary to decide whether the Company is engaged in a business affecting interstate commerce and governed by the N.L.R.A., or whether it is engaged in intrastate commerce and governed by the Pennsylvania L.R.A.

## Discussion on Merits.

■ But even if the court determined that jurisdiction existed, in our opinion the facts do not justify a conclusion that the Working Regulations constitute unlawful discrimination against the Negro drivers. On January 20, 1947, the Pennsylvania Public Utility Commission granted the application of the Owl Cab Company to operate motor vehicles as a common carrier in the Third and Fifth Wards of the City of Pittsburgh. This area is known as the "Hill District" and is inhabited predominantly by Negroes. The Owl Cab Company employs Negro drivers exclusively.

The defendant Company later in 1947 hired Negro drivers. They were engaged to render taxi service to the Negro section of the city and were so informed at the time each was hired. This restriction and resulting regulations were designed to per-

mit the Company to effectively compete with the newly created Owl Cab Company.

The Union approved this action of the Company although it had a list of available white drivers who were unemployed Union members.[9] Although counsel for plaintiffs does not object that the Union approved the Company's action in hiring Negroes, he assails the Union's approval of hiring Negro drivers to work out of the Uptown garage and restricting them to the Negro section as "segregation." The court does not view this arrangement as segregation, nor as unlawful discrimination toward Negroes. On the contrary, this policy resulted in beneficial employment of Negroes at the expense of available white drivers. No economic disparity was created. The Company records disclose that the average earnings of the Negro drivers are equivalent to or in excess of the average earnings of the white drivers.

Moreover, in these circumstances the right of the Company to hire whom it chooses has not been challenged by plaintiffs, nor have they called our attention to legislation abridging that right. To hold that a taxicab company, after hiring Negroes to serve a particular district in a large city, must change the terms of their employment in order that they might have the same opportunities and privileges of white drivers hired to service the city generally, would amount to legislating a "fair employment practice act" by judicial decree. It follows that the approval of this arrangement by the plaintiffs' bargaining representative, although it constitutes approval of discrimination against plaintiffs, is not actionable.

No one would contend that the discrimination was actionable if the white drivers working out of a certain garage were limited to a certain section of Pittsburgh, and

---

8. See Schatte v. International Alliance of Theatrical Stage Employees and Moving Picture Operators of United States and Canada, D.C.S.D.Cal.1947, 70 F.Supp. 1008, 1011, where the court held that "From the mere fact that a right was established by federal law, it does not

follow that all litigation growing therefrom arises under the laws of the United States."

9. White drivers had serviced the Hill District prior to this change of policy in 1947.

there was some evidence that in the past such limitations have been imposed.

To condemn the Company's policy, which plaintiffs' counsel bitterly assails as "segregation," would require us to hold that a limitation of work areas, deemed a competitive necessity by the Company, can be imposed only upon members of the white race, viz., white drivers. To condemn the Company's policy might eventually exclude Negro drivers from employment altogether and would certainly invite discrimination on account of race and color in individual hiring. This effect is to be deplored.

We do not think it can successfully be claimed that negotiations between the Company and the Union resulted in unlawful discrimination as to hours of employment, working conditions, preference as to seniority and the like.[10] The discrimination here existing stems from the fact that the Company wishes to compete in a Negro section against Negro drivers of another company. Primarily the discrimination arises as a means of competing for Negro customers and not because of the race and color of the drivers. If it is not unlawful to employ Negro drivers exclusively for such purpose, the Working Regulations adopted to implement that purpose do not constitute unlawful discrimination. The discrimination which does arise between the Negro drivers and the white drivers is incidental to lawful employment for competitive purposes in the Negro section of the city. If the discrimination against Negro drivers, agreed to by the plaintiffs' Union and the Company, under the circumstances of this case is lawful, the court cannot interfere with that judgment of both Union and Company as to what they believe is sound competitive practice.

We are of the opinion that the Union as bargaining agent should not now be enjoined from agreeing to the Working Regulations imposed on its Negro members who were restrictively hired and which were not imposed upon the white members generally hired. It must be conceded that these regulations are discriminatory in that the privileges granted to the white drivers in the city at large are denied to the Negro drivers who are restricted to the Negro section. It is argued that this rankles in the breasts of the Negro drivers, causes tension, and breeds trouble, which it undoubtedly does. But it must also be conceded that the regulations are primarily designed to provide adequate taxi service to the Negro population and to effectively compete with the Owl Cab Company. As stated, if this discrimination is on account of race and color, it stems primarily from the race and color of the inhabitants in the restricted area and the race and color of the competing drivers. In this light, the discrimination is more apparent than real, for the reason that plaintiffs were hired for one particular purpose, i. e., to work out of the Uptown garage and compete for Negro customers. It was naturally necessary to make restrictive rules to implement the purpose for which plaintiffs were hired by hastening their return to the Hill District.

Plaintiffs cannot legitimately complain that, after accepting employment for a particular area, they do not now have the rights and privileges of one who accepted employment generally for the entire city. From the court's point of view, it is deplorable that the Company, with Union approval, does not see fit to hire Negroes and permit them to work out of all its garages and service the entire city; but the court cannot substitute its ideas for the business policy of the Company; it is for the court to decide whether it was lawful for the

10. It was further proved that the Working Regulations did not affect the rights of the Negro drivers under the Company-Union Agreement in that all drivers receive 45% of the gross tariff, a minimum guarantee of $4 for a day's work, the same vacation pay depending on the number of hours of service, the same uniform allowance, the right to designate what shift they will work on and what day off they want according to their seniority, seniority status on the Master Seniority List determined by their length of service with the Company, life insurance benefits, sick and accident insurance, breakdown pay, reporting pay, and all other terms and conditions of the agreement between Company and Union.

defendants to agree to hire Negroes under these circumstances and to effectively regulate that hiring. Since the evidence is overwhelming that the Working Regulations agreed upon by the Company and the Union spring primarily from legitimate business considerations and are incidental to the specified employment which plaintiffs accepted, the court is of the opinion that the actions of the Company and plaintiffs' Union and the individual defendants are lawful and judgment will be entered in their favor.

### Findings of Fact.

1. Taxicab Drivers Local No. 128 and the Company have been bargaining collectively under voluntary agreements continuously since February, 1937.

2. All drivers of the Company have been and are members of the Union and have voluntarily authorized it to be their exclusive agent for collective bargaining purposes.

3. Since 1947, the Company hired plaintiffs and other Negro drivers to work out of the Uptown garage located in the Hill District in the City of Pittsburgh in order to service the predominantly Negro section of said City, being parts of the Third and Fifth Wards referred to as the "Hill District," and to effectively compete with another taxicab company servicing the Negro section which employs Negro drivers exclusively. Each of the plaintiffs consented to the terms of his employment which limited his work to the Hill District.

4. Prior to 1947, the Company hired white drivers to service the entire Pittsburgh area. Since 1947, the white drivers work out of three garages located in various sections of the city other than the Hill District and their work is not limited to any particular area; they compete with another taxicab company which employs white drivers exclusively.

5. The Working Regulations were designed to effectuate the purpose for which Negro drivers were hired by hastening their return to the Hill District.

6. No economic disparity between the average earnings of Negro drivers and the average earnings of white drivers has resulted from the Working Regulations.

7. All of the benefits provided by the Company-Union Agreement are conferred upon all of the drivers regardless of race or color.

### Conclusions of Law.

1. The Amendment to Complaint offered by plaintiffs at the conclusion of the testimony is allowed.

2. The Company-Union Agreement of 1950, being a voluntary contract entered into by the parties, does not arise "under the Constitution, law or treaties of the United States" and does not arise "under color of any State law."

3. The Union is the exclusive agent for collective bargaining purposes of all the drivers by virtue of the consent of all the drivers and not by virtue of the N.L.R.A. or the Pennsylvania L.R.A.

4. The Working Regulations agreed to by the Union do not constitute unlawful discrimination in violation of the Constitution or laws of the United States nor were they promulgated by virtue of any Act of Congress or under color of any State law.

5. The court is without jurisdiction in the matter.

6. It is not unlawful discrimination on account of race or color, absent fair employment legislation, for the Company to hire Negro drivers for the specific purposes set forth in Findings of Fact No. 3, and the imposition of reasonable regulations to effectuate that purpose are likewise not unlawful.

7. Plaintiffs have failed to sustain their burden of proving unlawful discrimination in the Hill District where they were restricted by the terms of their employment.

8. The complaint should be dismissed.