[Civ. No. 16035. First Dist., Div. One. Dec. 30, 1954.]

ROBERT E. BARBER et al., Appellants, v. CALIFORNIA EMPLOYMENT STABILIZATION COMMISSION et al., Respondents.

[Civ. No. 16036. First Dist., Div. One. Dec. 30, 1954.]

HAROLD CROUSE et al., Appellants, v. CALIFORNIA EMPLOYMENT STABILIZATION COMMISSION et al., Respondents.

Gladstein, Andersen & Leonard and Lloyd E. McMurray for Appellants.

Edmund G. Brown, Attorney General, Irving H. Perluss, Assistant Attorney General, William P. Shaw and Vincent P. Lafferty, Deputy Attorneys General, and Richard Ernst for Respondents.

Richard Ernst, as Amicus Curiae on behalf of Respondents.

PETERS, P. J.—In these two cases, each involving a group of claimants, the Unemployment Insurance Appeals Board denied unemployment benefits to the respective petitioners. Both groups sought a review of these determinations by writs of mandate in the superior court pursuant to the provisions of section 1094.5 of the Code of Civil Procedure. These petitions were denied. Petitioners appeal. The two proceedings have been consolidated for the purpose of appeal.

In the Barber action all appellants are members of the National Union of Marine Cooks and Stewards, while in the Crouse action all appellants are merchant seamen belonging to the Marine Firemen, Oilers, Watertenders and Wipers Union. In addition, each group of claimants avers that they are not only suing on their own behalf, but also on behalf of all others similarly situated. The theory of the claims is that prior to September 2, 1948, each of the claimants had

left his employment and was unemployed, awaiting assignment to another job from his hiring hall. On that date the unions of which appellants are members engaged in a trade dispute with, and refused to work on any ships operated by, the Pacific American Shipowners' Association, since superseded by the Pacific Maritime Association. This association represents the owners and operators of at least 90 per cent of all ships operating out of San Francisco harbor. The strike continued from September 2d until December 3, 1948. Appellants claim that they are entitled to unemployment benefits for that period. At oral argument appellants claimed that some of the petitioners had been denied benefits that had accrued before September 2d, but in the memorandum filed after argument they have failed to substantiate this charge by reference to the record. The opinions of the Appeals Board and the decision of the superior court make it perfectly clear that only the period of the strike was considered and passed upon.

In filing their claims for unemployment benefits covering the period of the work stoppage, the appellants averred that they all had been unemployed prior to the dispute for reasons unconnected with that dispute. This allegation is true in the sense that all the appellants had completed prior assignments and were registered for employment at their respective hiring halls. None of the appellants was working for a particular employer, or drawing wages from a particular employer, on September 2, 1948. The Department of Employment held that all of the appellants were unemployed on September 2, 1948, had not left their employment because of a trade dispute, and were entitled to unemployment benefits. On application to the board, the referee in the Barber case came to the same conclusion, but the referee in the Crouse case ruled that the appellants in that case had left their employment because of the trade dispute within the meaning of section 56(a) of the Unemployment Insurance Act. (3 Deering's Gen. Laws, Act No. 8780d. This statute, somewhat modified, is now codified in the Unemployment Insurance Code.) On separate appeals to the Unemployment Insurance Appeals Board that board, in separate opinions, reversed the referee in the Barber case and affirmed the referee in the Crouse case, thus denying to the appellants in both cases the right to unemployment benefits. Upon review of these decisions by writ of mandate to the superior court that court reexamined the record of the administrative hearings, rejected certain additional exhibits

offered by appellants, and found the facts substantially as found by the Appeals Board. It concluded from these facts that all appellants had left their work because of the trade dispute, and were, therefore, not entitled to unemployment benefits.

It should be mentioned that as to appellants Crouse, Mercado and Souza, the Appeals Board denied them benefits on the ground that their rights thereto had been determined adversely to them in a prior case. These appellants alleged in their petitions in the Crouse case that all of the petitioners in the prior case had been denied benefits solely on the ground that their appeal to the board had not been timely filed, and averred that such ruling constituted an abuse of discretion. There is nothing in the present record to support this averment. The superior court did not make a finding as to this allegation, but simply denied the writ as to them on the same grounds as was done in reference to all other appellants. They will not be separately considered in this opinion.

The right to benefits, or conversely, the lack of any right to benefits, must turn upon the proper interpretation of the provisions of the Unemployment Insurance Act as it read in 1948. (3 Deering's Gen. Laws, Act No. 8780d.) The basic section involved is section 56(a). It then read:

"An individual is not eligible for benefits for unemployment, and no such benefit shall be payable to him under any of the following conditions:

"(a) If he left his work because of a trade dispute and for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed."

Both the Appeals Board and the superior court held that, under this section, the appellants had left their work as a result of the trade dispute, remained unemployed because of that dispute, and during the period of the strike would not have accepted employment with any of the employers comprising the employer's association. The appellants contend that prior to the trade dispute they were unemployed, that they did not leave their work because of the trade dispute, and that they were not unemployed because of the trade dispute within the meaning of section 56(a).

In order to understand the proper application of this section to these cases reference must be made to the rather unique hiring procedures applicable to members of the two unions here involved.

The appellants, as union members, worked under collective contracts entered into between the unions and the employer's association, the latter representing nearly all steamship companies operated out of San Francisco. These agreements included provisions for preferential hiring, that is, the employers agreed to give preference in employment to members of the unions. All such employees were to be hired through the union hiring halls. Each union maintained a hiring hall for its respective members and the employers had no voice in their operation. Employers placed orders for workers with the union by telephone and indicated the number of 'men wanted, the required ratings or qualifications, and time and place to report. In order to be eligible for work a member had to be registered with the union. Upon registration a printed card called a "shipping card" was issued to the member, giving the exact time of registration and a number to each registrant. Regular attendance at union meetings was a requisite to maintaining active registration. The dispatcher each hour of each working day announced to those present in the hall the jobs that were open, and the qualifications of the vacant positions. A member could, if he so desired, present his shipping card by way of application for the announced opening. If the dispatcher found him qualified to fill the position and if his registration was the oldest active one in point of time, he would be issued an assignment card designating the vessel to which he was to report. Under the collective bargaining agreements it was permissible for a seaman to continue in employment for one employer for an indefinite period if it were mutually agreeable, but in most cases employment with a single company did not extend beyond one or two voyages. A registrant was privileged to refuse three offers of work. If he refused a fourth offer, his current registration was forfeited and he would be required to re-register. All registrants were required to re-register every 45 days. Nonunion persons were permitted to register at the hiring hall, and if no union man was available for an open position, the nonunion man would be assigned by the dispatcher to the proper ship.

By these agreements, it is apparent that the employees had bargained away their right to negotiate for employment with any particular employer, and the employer had, for all practical purposes, bargained away his right to negotiate in reference to employment with particular employees. Under

this hiring hall system, except in minor particulars not here relevant, each registered member of the union had a contract right to his proportion of the work available.

The collective bargaining agreements between the unions and the employers' association expired on June 15, 1948. Negotiations to amend the agreements had begun prior to this date and continued until September 1, 1948. Between June 15th and September 1st, although the contracts had expired, the employers continued to place orders with the hiring halls and the unions continued to dispatch their members in fulfillment of such orders. In other words, the provisions of the collective bargaining agreements were observed although the contracts had expired. This was done by reason of an injunction issued by the United States District Court under the provisions of the Taft-Hartley Act. At the conclusion of the statutory 80-day cooling-off period, the final offers of both sides were rejected, and the unions established picket lines at the various piers where vessels of the employers were docked. The cooks and stewards union voted not to work without a contract, and the marine firemen, while not calling a strike under the procedures outlined in its constitution, nevertheless referred to the situation as a "strike." The union officials expressed the view that ''we can't work without a contract.''

Members of the employers' association did not place any orders for union men during the period September 2d to December 2, 1948. When any of their vessels docked at ports in the United States, the union members refused to continue their work. Ultimately, a new collective bargaining agreement was reached by the disputants on December 2, 1948, and the work stoppage ended. These cases involve the right to unemployment benefits during the period September 2d to December 2, 1948.

Before discussing the legal rights of the parties some generalizations can be made about appellants. They have not seen fit in their briefs to point out by transcript references what appears therein as to the actions of each appellant prior to and during the strike, singling out only a very few of the appellants for this purpose. We have, however, read the administrative transcripts. From them it appears that each of the appellants is a union member. Each appellant, for a variety of reasons, was "on the beach" prior to the commencement of the strike. Each appellant had registered for

employment with his hiring hall,* and thus maintained his status in the pool of available seamen. The record also shows that practically every appellant actively participated in the strike. All were issued picket cards. Some were assigned to picket duty at the piers for six hours every other day. Some helped around the union hall, or were excused by a union clearance committee. Some worked in the pickets' soup kitchen.

*Is this a class suit?*

The first point to be determined is whether this is a class suit. In their respective petitions appellants alleged that the actions were brought not only on behalf of the named claimants, but also on behalf of many "hundreds" of un-named merchant seamen in California who have been denied unemployment insurance benefits under substantially similar circumstances as were the named appellants. Respondents, who are the officials of the Employment Stabilization Commission, the Director of Employment and the Unemployment Insurance Board,† unsuccessfully attempted by a pretrial motion to have these class suit allegations stricken from the petitions. After trial of the mandate proceeding, however, the superior court specifically found that the allegations that this was a class action were untrue. On these appeals the contesting parties argue pro and con the merits of this ruling. Most of these arguments confuse the questions of who are proper, necessary or indispensable parties with the question of whether or not this is a class suit. (For a discussion of necessary and indispensable parties see 2 Witkin, California Procedure, p. 1049, § 72; for a discussion of class suits see 2 Witkin, California Procedure, p. 1079, § 99.) This confusion arises, apparently, because section 382 of the Code of Civil Procedure combines the subject of who must be joined in an action with the subject of class suits. The first part of the section deals with joinder. The last phrase of the section provides for class suits in the following language: "and when the question is one of a common or general interest,

---

*The one exception is Ernest Buffman, named as an appellant in the Crouse appeal. He had apparently withdrawn from the maritime industry in June of 1948. His case was specifically withdrawn from consideration when the Crouse proceeding came before the Appeals Board. He was apparently erroneously included in the mandate proceeding and in the notice of appeal.

†The Pacific American Shipowners' Association, now the Pacific Maritime Association, has filed separate briefs in support of the trial court's determinations.

of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all.''

It is certain that the minimum requirements of a class suit under this language are (1) there must exist a well defined community of interest in questions of law and fact between those bringing the suit and those claimed to be represented, and (2) the suing and nonsuing groups must constitute a definite ascertainable class. If the rights of each member of the class are dependent upon facts applicable only to him, there is not the requisite ascertainable class required for a representative suit. This was clearly illustrated in *Weaver* v. *Pasadena Tournament of Roses Assn.,* 32 Cal.2d 833 [198 P.2d 514]. (See also *Parker* v. *Bowron,* 40 Cal.2d 344 [254 P.2d 6].)

At page 838 of the Weaver case the court stated:

''But plaintiffs misconstrue the nature of this litigation. The causes of action of the several plaintiffs and the other unnamed aggrieved individuals are separate and distinct. The question, as to each individual plaintiff, is whether *he* 'as a person over the age of twenty-one years' presented himself and demanded admittance to the game, whether *he* tendered the price of the ticket, and whether, as to *him,* the refusal of admission was wrongful under section 53 of the Civil Code . . . Moreover, other independent factors of consideration arise in connection with the respective individual claims . . . Thus, a decision favorable or adverse to these plaintiffs—or any one of them—could not determine the rights of any of the unnamed parties whom plaintiffs purport to represent.''

The following quotations at pages 839 and 842 are also applicable:

''In the present case there is no ascertainable class, such as the stockholders, bondholders, or creditors of an organization. Rather, there is only a large number of individuals, each of whom may or may not have, or care to assert, a claim against the operators of the 1947 Rose Bowl Game for the alleged wrongful refusal of admission thereto. . . .

''. . . Rather, these unknown parties are ascertainable only insofar as each may come forward and individually present proof of all the facts necessary to authorize a recovery in accordance with the merits of his particular case, and judgment in one would by no means be a judgment in any other. Plaintiffs here do not claim to represent an association or

protective committee nor do they present any reasonable basis for ascertaining the members of the alleged class for whom they seek to act in this litigation.''

In the instant case, by the very nature of the facts, each of the named claimants must stand or fall upon facts applicable only to himself. Obviously, the status of each claimant as to his employment or unemployment prior to the trade dispute and his actions during the trade dispute depend upon the facts applicable to that claimant. Conceivably, there could be an almost indefinite number of factual situations applicable to the ''many hundreds'' of those claimed to be similarly situated that appellants seek to make parties to this action without their knowledge, consent or participation. Quite clearly a judgment that Crouse or Barber is entitled or not entitled to benefits could not or should not operate as res judicata as to those not parties. Thus, it is quite clear that the trial court properly determined that this was not a class suit.

*Under section 56(a), are appellants barred from unemployment benefits?*

The Appeals Board and the superior court answered this question in the affirmative, and we think correctly so. Appellants' argument is relatively simple. All appellants were ''on the beach'' on September 2, 1948, when the work stoppage began, in the sense that they were not working for any particular employer. Therefore, say appellants, none of them ''left his work'' because of a trade dispute. They were ''unemployed'' when the work stoppage started for reasons unrelated to the trade dispute. Therefore, say appellants, section 56(a) has no application. Appellants contend that the superior court must have held that membership in the respective unions alone was sufficient to disqualify them, because that, so it is argued, constitutes appellants' only connection with the trade dispute.

The problem is not so simple. While it must be conceded, and respondents do concede, that union membership alone is not sufficient to disqualify a claimant, this case involves more than mere union membership. Here, under the collective bargaining agreements the employers agreed to hire through the hiring halls under a procedure that gave each union member a contract right to his proportional share of work. As already pointed out, under the collective bargaining agreements, the employees bargained away their right to seek work from or to negotiate with individual em-

ployers, and the employers bargained away their right to negotiate with individual employees. Under this system, each registered member, although technically out of work, had a contract right to his proportional share of all work available. Under such circumstances, it is settled by prior decisions, that all registered members have such a group attachment to all available work that when a strike is called, and a work stoppage results, it must be held that each such registered member ''left his work'' because of the trade dispute, and is therefore disqualified from receiving benefits under section 56(a).

The three leading cases on this subject, all decided on the same day, are *Matson Terminals, Inc.* v. *California Emp. Com.*, 24 Cal.2d 695 [151 P.2d 202]; *American-Hawaiian S.S. Co.* v. *California Emp. Com.*, 24 Cal.2d 716 [151 P.2d 213]; and *W. R. Grace & Co.* v. *California Emp. Com.*, 24 Cal.2d 720 [151 P.2d 215].

The Matson case is the key case. It involved longshoremen who refused to work because they refused to cross a picket line set up by the Ship Clerks' Union. In *Bodinson Mfg. Co.* v. *California Emp. Com.*, 17 Cal.2d 321 [109 P.2d 935], the Supreme Court had held that an employed union member who refused to work because another union had set up a picket line had ''left his work'' because of a trade dispute and was not entitled to benefits under section 56(a). Thus, the only question was whether, under the facts in the Matson case, the longshoremen who refused to cross the picket line had ''left'' their work because of a trade dispute. These longshoremen operated under a hiring hall procedure set up by agreement between the employers and the longshoremen's union that was substantially similar to the one here involved. The only substantial difference between the Matson agreement and those here involved was that in the Matson case the hiring hall was jointly operated by the employers and the union, while in the instant case the collective bargaining agreements provide for union operation. But the basic purpose of this hiring hall procedure was the same in both cases. In the Matson case the court stated that by such hiring procedure the union ''seeks to make work opportunities available to all longshoremen equally by dispatching them in rotation to jobs.'' (P. 698.) That same purpose is equally apparent in the instant cases.

The longshoremen, in the Matson case like the appellants in the instant cases, worked intermittently for various em-

ployers. When the strike was called by the Ship Clerks' Union on November 10, 1939, some of the longshoremen were working for particular employers, others, like the claimants in the instant case, were registered at the hiring hall and not working, while others were working for employers not involved in the strike. This last group worked until their particular assignments were finished, when they, like the others, refused to work. All were denied benefits.

The administrative board had allowed all claimants unemployment benefits for the period of the strike. In reversing the commission as to all claimants, and with particular reference to those who were registered with the hiring hall but not working when the strike was declared, the Supreme Court had the following to say about section 56(a) (p. 704) : ''The section provides that a claimant is ineligible for benefits while 'he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed' and thus contemplates that the 'work' that claimant left was in an 'establishment in which he was employed.' The commission contends that the word 'employed' envisages the 'legal relationship of employer and employee' between the claimant and a particular employer at the precise moment that the trade dispute arises, and that a longshoreman in the interim between work assignments is not 'employed' for the reason that he is under no contract of hire, but simply has a right to be dispatched to a new assignment in his proper rotational order and, therefore, does not stand in the legal relationship of employer and employee with any particular employer. Under the commission's interpretation of section 56(a) the waterfront docks do not constitute an 'establishment' since they were separately owned and controlled by the various companies and were operated as separate enterprises.

''Had the Legislature intended, however, that disqualification under section 56(a) should turn on whether the claimant had ended a legal relationship of employer and employee at the precise moment the trade dispute arose, it would hardly have failed to speak in terms of that relationship or to provide some standard by which its existence at that time could be determined. It is unlikely that the Legislature would leave it to the commission, a body of laymen, to deduce such an intention from the words 'left his work' by way of a presumed definition of the word 'employed.' Since there is no generally accepted test for determining at a particular

moment whether a person is 'employed' it cannot be presumed that the Legislature intended such a test when it used that word in section 56(a). The test for such a determination may vary according to the nature of the rights and liabilities involved."

After discussing the several meanings of the word "employed," the court stated (p. 706) : "A registered longshoreman, however, has more than. an expectancy; his right to work is more secure than that of the ordinary employee, for he has a legally enforceable right whereby the group is entitled to first call on the work and each longshoreman is entitled to his share. Although he does not work regularly for the same employer at the same place of business, a procedure forbidden by the contract between the longshoremen's union and the employers' association, and the intervals between work assignments may at times be longer than those for a factory worker, because of the intermittent nature of longshore work, he works under an employment arrangement that assures him his proportionate share of the work on the San Francisco waterfront. He is not permitted to look for work with the individual members of the employers' association but is dispatched to the various docks where his services are required, in his turn in the manner described. Under the arrangement provided by the contract the longshore work of the port is his work. If there is work to be done the employers cannot refuse it to him. The interval between work assignments is a normal incident of his employment. The longshore work that each claimant regularly performed for the various members of the employers' association, and to which he had an exclusive right was 'his work' within the meaning of section 56(a). That work cannot be taken from him except by joint action of his union and the employers' association acting through the Joint Labor Relations Committee. It was this work that claimants left when they refused to perform it during the ship clerks' strike.

"The commission's interpretation of 'establishment' as each place of business of each employer, however apt it may be generally, does not fit the facts in the present case. The longshoremen's work and its locale are governed by contract. One of the objects of the contract was the abolition of the system that normally prevailed when some longshoremen worked regularly for one employer while others had only occasional work. Under the contract all registered longshoremen are assigned through the hiring hall to all the work of

all the employers. As applied to these facts the term 'establishment' as used in section 56(a) means the place of employment, namely, the various docks covered by the contract, where the longshoremen customarily work. This was the area covered by the ship clerks' strike. The disqualification of the claimants therefore continued for the period covered by that strike.''

In concluding this portion of the discussion the court stated (p. 707) : ''The act establishes a policy of neutrality in trade disputes by provisions that the payment or withholding of benefits should not be used to aid either party to a trade dispute. Thus the provision disqualifying a worker who leaves his work because of a trade dispute § 56(a) is balanced by the provision that other unemployed workers shall not be required to fill the vacated jobs or lose their right to unemployment insurance benefits. (§ 13(b)(1).) The payment of benefits to a claimant who leaves his work because of a trade dispute would conflict with this policy just as would the withholding of payments because a claimant refused to become a strikebreaker.

''As all the claimants in this case left their work because of a trade dispute, they are disqualified under section 56(a) from receiving benefits for unemployment during the period of the dispute.''

The *American-Hawaiian S.S. Co.* v. *California Emp. Com.*, 24 Cal.2d 716 [151 P.2d 213], case, so far as the instant cases are involved, adds little to the discussion. There were involved various members of the Ship Clerks' Union who claimed unemployment benefits for the period of the same strike that was involved in the Matson case. Their employment procedure was substantially similar to that applicable to longshoremen. Their collective bargaining agreement had expired prior to the strike, but, pursuant to agreement of the parties, the provisions of that contract were continued in effect after expiration and up to the time of the work stoppage. In the instant cases the collective bargaining agreements expired in June of 1948, but they were continued in effect by a Taft-Hartley injunction. All concede that until September 2, 1948, when the work stoppage started, the parties abided by the terms of the collective bargaining agreement. So far as the employees' right to unemployment benefits is concerned, it would seem immaterial whether the hiring hall arrangement was provided for by express contract, by arrangements to continue it in effect as in the American-

Hawaiian case, or by implied contract or by virtue of a Taft-Hartley injunction, as in the present cases. The real question is, what was the relationship between the parties at the time of the work stoppage?

The checkers involved in the American-Hawaiian case were of four classes. (1) Monthly checkers, working for one employer on a monthly salary; (2) preferred checkers, working generally for one company, unless the employer had no work for two days, in which event this group became casual daily checkers; (3) casual daily checkers, who worked for various employers on a rotation basis substantially similar to that here involved; and (4) permit checkers, who were nonunion checkers who were assigned jobs when the casual daily checker list was exhausted. Citing the Matson case, the court held as to all four groups of checkers (p. 719): ''Since the claimants went on a strike against petitioners and refused to work for them during the strike, they left their work because of a trade dispute within the meaning of section 56(a) of the California Unemployment Insurance Act, *supra,* and are precluded by that section from receiving benefit payments for unemployment during the period of the strike.''

The third case, the Grace Company case, need not be discussed at length. There the Ship Clerks' Union struck against the American-Hawaiian Steamship Company and established picket lines. Various groups of longshoremen, other than those involved in the Matson case, were affected. Some longshoremen, when they reported to the docks, were told by the employers that there was no work unless they were willing to work without checkers, while others quit work when they reached the stage checkers were needed. As to these two groups, the court, relying on the Matson and American-Hawaiian cases, held that the longshoremen had left their employ because of the trade dispute within the meaning of section 56(a) and were barred from benefits.

Other longshoremen were simply told by their employers to return to the hiring hall before or after they had started work. As to this group it was held that section 56(a) was not applicable unless they were told to return to the hiring hall because they refused to work without checkers, and this portion of the case was returned to the commission to make a finding on the issue.

These cases are decisive of the present controversy, adopting as to the maritime industry using hiring halls of the type here involved, a concept of group attachment to avail-

able work. Under the hiring hall procedure involved in the instant case, and under the terms of the collective bargaining agreements, the employees, as well as the employers, had bargained away their respective rights to individually negotiate with each other. Under such an arrangement, each registered member of the union had a claim to available work based on the rotation of assignments through registration numbers.

The fact that closed shop agreements have now been prohibited under the Taft-Hartley Act does not affect the actual facts. If, under a hiring hall procedure such as is here involved, each registered employee in fact has a group attachment to all available work, then the fact the registered union member was not actually working on the date the strike was called is a false issue. He nevertheless "left his work" because of the trade dispute within the meaning of section 56(a). The test, according to the Matson case, is whether the petitioners, because of their group attachment to their work, had a reasonable expectancy of receiving the struck work, though "based only on a probability." If so, it is the work of the striker.

The trial court found not only that all appellants became unemployed because of the trade dispute, but also that they would not have accepted employment with respondent employers because of the trade dispute. Apparently the court made this finding in order to indicate that section 13(b)(1) of the Unemployment Insurance Act was not applicable. That section provides:

"Notwithstanding any other provisions of this act, no work or employment shall be deemed suitable and benefits shall not be denied to any otherwise eligible and qualified individual for refusing new work under any of the following conditions.

"(1) If the position offered is vacant due directly to a strike, lockout, or other labor dispute."

Appellants urge that since they were unemployed on September 2d, the work, if any, thereafter was "new work," and that they cannot be disqualified because they refused to accept "new work" made available because of the labor dispute.

The difficulty with this argument is that the major premise upon which it is predicated is contrary to the facts. If the appellants had not left their work because of the trade dispute, a sound argument could be made that they could not be deprived of benefits because they refused "new work" made

vacant because of the strike. But section 13(b)(1) has no application to situations in which section 56(a) is applicable. If the men left their work because of a trade dispute within the meaning of section 56(a), they are ineligible for benefits during the period of the strike, because the jobs thus made vacant are their jobs and not as to them "new work." Thus, had an association employer during the strike period offered work, through the hiring hall procedure, to any one appellant, it would not have been "new work" as to that appellant, but work already belonging to him by right and virtue of his membership in the labor pool from which the employer must draw his employees. In such a case the offered work is the regular work each registered member already claims, although its assignment rotates through the registered group who are awaiting vacancies and assignment.

The provisions of section 13(b)(1) are common to the unemployment insurance laws of every state. Such provision must be included in the state law in order that the employers may receive certain tax credits and the states some financial aid. The obvious intent of the provision is that applicants shall not be denied benefits because they refuse to perform "new work" made vacant by the strike. Under sections 56(a) and 13(b)(1) an employee cannot be denied benefits because he refuses to become a strikebreaker, but that rule does not apply to work in the claimant's last employment. That is not "new work." The work made vacant by a strike is "new work" only to strangers to the strike. It is not "new work" to the strikers themselves when they fall within the classification made by section 56(a).

Appellants devote a considerable portion of their briefs to the contention that if sections 56(a) and 13(b)(1) be interpreted as set forth in this opinion, it will place the California law out of conformity with the federal Unemployment Tax Act. (26 U.S.C. 1602-1603.) Under that act a tax is levied against employers, but employers are allowed a 90 per cent credit to the extent of contributions made to a state act provided the state law is certified by the Secretary of Labor as being in conformity with the federal act. In addition, the Social Security law provides that some federal funds will be supplied to state unemployment administrators in the event the state law has been approved by the Secretary of Labor. The federal act (26 U.S.C. 1603) provides as does section 13(b)(1) that compensation shall not be denied if

the position offered to the applicant is "new work" made vacant because of a trade dispute.

Much comment appears in the briefs about a hearing held by the Secretary of Labor in Washington, D. C., in December, 1949, to determine whether the California law was in conformity with federal law, and this court permitted the record to be augmented to include various documents relating to that hearing. This evidence is relevant on the issue of interpreting the California law. But certainly there is no lack of conformity in determining that one who has left his employment because of a trade dispute is not entitled to benefits. Nor is there any lack of conformity in the holding that under the collective bargaining agreements and the hiring hall procedures all registered members have such a group attachment to all available work as to make such work their work. That has been the California law certainly since 1944 when the Matson case was decided. The Secretary of Labor has certified the California law as being in conformity with the federal law each year since 1944. The only possibility of lack of conformity would exist under certain interpretations of section 13(b)(1). But for reasons already stated, we never reach that section in the present cases because all appellants are disqualified under section 56(a).

The trial court struck from the record the exhibits which were subsequently made part of the record on appeal by the augmentation process. As already pointed out, those documents might have some relevancy in interpreting the California statute. But interpretation is a matter of law, not of fact. The improper exclusion of these documents could not possibly have harmed appellants, because, had they been admitted and considered, they would not even suggest that the interpretation of section 56(a) contained in this opinion and based on the Matson case is erroneous.

The other points raised do not require discussion.

The judgments appealed from are affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied February 24, 1955. Carter, J., was of the opinion that the petition should be granted.