[Civ. No. 25440. Second Dist., Div. One. Jan. 31, 1962.]

CHRYSLER CORPORATION, Plaintiff and Respondent, v. CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS BOARD et al., Defendants and Appellants.

Stanley Mosk, Attorney General, and Herschel T. Elkins, Deputy Attorney General, for Defendants and Appellants.

McCutchen, Black, Harnagel & Shea, G. William Shea, Robert P. Simpson and Jack T. Swafford for Plaintiff and Respondent.

LILLIE, J.—This proceeding in mandamus to compel removal of charges against an employer's unemployment reserve fund is before us on appeal by the California Unemployment Insurance Appeals Board from a judgment of the superior court declaring claimants to be ineligible for unemployment compensation benefits. The judgment set aside a decision of the board upholding their eligibility, and ordered any charges against respondent's account as the result of payment of

unemployment benefits to be removed. We conclude on the record before us that by reason of the construction and application of section 1262, Unemployment Insurance Code, by the Supreme and appellate courts of this state, claimants are entitled to benefits, and the judgment should be reversed.

The superior court reviewed the administrative record and made and filed its independent findings and conclusions of law (*Chrysler Corp.* v. *California Emp. Stab. Com.*, 116 Cal. App.2d 8 [253 P.2d 68]); they are at complete variance with the administrative findings and determination, but the basic material facts are undisputed and the question is primarily one at law. The claimants, 81 in all, are employed as office and clerical workers and engineers in the Los Angeles plant of respondent, Chrysler Corporation. Union workers at this plant are divided into three separate and distinct bargaining units—the 1. office and clerical workers, 2. engineers and 3. production and maintenance workers, all of which comprise Local 230. The International Union, United Automobile, Aircraft and Agricultural Implement Workers of America (hereinafter referred to as UAW), an affiliate of the Congress of Industrial Organizations (CIO), organized Local 230 as an "amalgamated local" consisting of the three separate bargaining units above named; the bulk of its membership consists of production and maintenance workers since there are relatively few office and clerical workers and engineers. In other areas of the country where there are enough to warrant it, the office and clerical workers have their own local, as do the engineers. Each unit of Local 230 had entered into a separate bargaining agreement with Chrysler; thus, during the period in question, three separate agreements covering labor relations of its 1. engineers, 2. office and clerical workers, and, 3. production and maintenance workers, existed with Chrysler.

The "engineers' " contract and the "office and clerical workers' " contract each contained a specific provision (§ 5), in effect, prohibiting them from striking against Chrysler; thus, under their contracts neither the engineers nor office and clerical workers had any right to strike. The "production and maintenance workers' " contract, however, made an exception (§ 31(2)) permitting them to strike in connection with rates of production (§§ 46-48); thus, thereunder, the production and maintenance workers had the right to strike over this limited matter. The contracts of the office and cler-

ical workers and engineers contained no provision relative to rates of production.

A dispute arose between Chrysler and the production and maintenance workers over the "Rates of Production" provisions of their contract. In March 1957, on recommendation of the executive board of Local 230 consisting primarily of officers of the union, a strike vote was taken by the production and maintenance workers; none of the office and clerical workers or engineers were entitled to vote in this connection and none did so, although as a group they did voice their disapproval of the strike and voted not to participate therein. They had no economic or other grievance with Chrysler. On March 15, pursuant to approval of the International Union, union officials called a strike of the production and maintenance workers; they immediately left their jobs. The strike ended April 21, 1957, after a settlement, the terms of which related to matters affecting only the production and maintenance workers. The office and clerical workers and engineers did not strike at any time, nor did they in any way participate in the strike or picket line; on the contrary, on March 15, when the strike commenced, they crossed the union picket line, remained at their jobs and continued to perform all work available to them. However, the strike forced Chrysler to shut down its production line, soon after ending the flow of work for its office and clerical workers and engineers. They continued to work until around March 22, when thereafter, to April 15, at various times they were laid off by Chrysler because it had no work for them. During the course of the strike, the production and maintenance workers received strike benefits from the union's general strike fund; the office and clerical workers and engineers received nothing from the strike fund but applied for and received unemployment compensation benefits, the subject of the within litigation.

The basic question is whether Chrysler's unemployment reserve account should be charged as the result of benefits paid to the office and clerical workers and engineers—the issue turns on whether they are eligible therefor under section 1262, Unemployment Insurance Code. Appellant contends that they did not voluntarily leave their work because of a trade dispute; respondent argues that they left voluntarily in that their unemployment was caused by a trade dispute initiated by their own union.

Section 1262 provides that "An individual is not eligible

for unemployment compensation benefits, and no such benefit shall be payable to him, if he left his work because of a trade dispute . . .'' This section has been consistently interpreted in accord with ''the obvious legislative intent that persons who are involuntarily and innocently out of work as the result of a labor dispute should not suffer by loss of unemployment benefits. Accordingly the right to benefits under section 56 of the statute was said to depend upon whether the worker left his job of his own free will or was forced to do so because of the acts of others.'' (*McKinley* v. *California Emp. Stab. Com.*, 34 Cal.2d 239, 242 [209 P.2d 602] ; *Bodinson Mfg. Co.* v. *California Emp. Com.*, 17 Cal.2d 321 [109 P.2d 935] ; *Bunny's Waffle Shop, Inc.* v. *California Emp. Com.*, 24 Cal.2d 735 [151 P.2d 234] ; *Gardner* v. *State*, 53 Cal.2d 23 [346 P.2d 193] ; *Chrysler Corp.* v. *California Emp. Stab. Com.*, 116 Cal. App.2d 8 [253 P.2d 68].) The ''volitional test'' was first established by the Supreme Court in *Bodinson Mfg. Co.* v. *California Emp. Com.*, 17 Cal.2d 321 [109 P.2d 935]. Therein the court held that members of one union who became unemployed solely because they refused, by reason of union principles, to pass a peaceful picket line of another union at their place of employment, were not entitled to unemployment benefits; that having exercised their free choice not to work in a plant where their fellow members were on strike, their resulting unemployment was voluntary.

 To carry out the intent of the Legislature, the courts in a given case inquire into the economic realities of the circumstances resulting in unemployment to determine whether there was any personal responsibility on the part of the claimant for his unemployment, or whether he was compelled to leave his work because of the acts of others. (*Bodinson Mfg. Co.* v. *California Emp. Com.*, 17 Cal.2d 321 [109 P.2d 935] ; *Bunny's Waffle Shop, Inc.* v. *California Emp. Com.*, 24 Cal.2d 735 [151 P.2d 234] ; *Matson Terminals, Inc.* v. *California Emp. Com.*, 24 Cal.2d 695 [151 P.2d 202] ; *Chrysler Corp.* v. *California Emp. Stab. Com.*, 116 Cal.App.2d 8 [253 P.2d 68].) ''The volitional test itself is based upon a just analysis of a substantial subjective element and it cannot properly be extended or perverted by insistence upon mere form.'' (*McKinley* v. *California Emp. Stab. Com.*, 34 Cal.2d 239, 245 [209 P.2d 602].)

 Certain compelling factors leading to the unemployment of the office and clerical workers and engineers point

up the absence of any voluntary act or conduct therefor on their part under section 1262, unless it can be said that mere membership in the union is sufficient to render them personally responsible for the acts of their union officials in authorizing the strike of the production and maintenance workers. And this is exactly the claim respondent makes here, arguing that in joining the UAW, the office and clerical workers and engineers submitted themselves to the by-laws and International Constitution which designated Local 230 and the union as their exclusive collective bargaining agents, making them personally responsible for their acts authorizing the strike of the production and maintenance workers against their common employer; and that it was reasonably foreseeable by them that they would ultimately be laid off in consequence of such a strike. This argument is predicated on the claim that the office and clerical workers and engineers voluntarily joined the union and Local 230, and on certain facts relating to their union membership—they took the same oath as the production and maintenance workers, paid the same dues, part of which went into a general strike fund of the International Union, had a right to participate in the election of, and were governed by, common union officials, and became subject to the same by-laws and International Constitution which designated the local and the International Union as their exclusive bargaining agents.

In the light of the established principle that innocent victims of a trade dispute should not suffer loss of their unemployment insurance rights, and the prevailing unusual factual situation, we believe there must be something more than mere membership in the union authorizing the strike against their common employer, to make the nonstriking members personally responsible for the same, such as—their voluntary joint activity, concert of action of the strikers and nonstrikers, an identity of interest in the dispute or strike, or union strategy ultimately resulting in the unemployment of nonstriking members.

It is true, as urged by respondent that each office and clerical worker and engineer, exercising his fundamental right to work, did voluntarily seek and accept employment with Chrysler. However, unlike the employee, who of his own volition enters into membership in a union because he feels that his best financial interests will be served thereby, the office and clerical workers and engineers had no free choice in the

matter, for as a condition of their employment with Chrysler they were required to join the UAW. Nevertheless, for the purpose of these proceedings we assume their membership in the union to be voluntary. But such an assumption meets with more difficulty in connection with their membership in Local 230—for inasmuch as their number was so small as to not warrant organization of a separate local, they were compelled to join Local 230, which consisted mainly of production and maintenance workers. Because they were so few, the office and clerical workers and engineers constituted at most only a negligible factor in Local 230, with limited or almost no voting strength as compared with the remaining membership. Nor did they have any voting power in connection with the matter of strikes, having by contract been deprived of their right to strike against Chrysler. That their contracts with respondent were entered into by both parties voluntarily cannot be denied, but as a practical matter the surrender of their right to strike was without doubt a concession the office and clerical workers and engineers had to make to Chrysler when the agreements were entered into. On the other hand, in its contract with the production and maintenance workers Chrysler permitted them to retain their right to strike on the limited matter of rates of production.

What occurred leading up to and during the strike discloses a complete absence of any act or conduct on the part of the office and clerical workers and engineers in connection with, or in furtherance of, the strike; a complete lack of any grievance between them and Chrysler or any interest in the dispute between Chrysler and the production and maintenance workers; and a protest against union action calling the strike reflected in their disapproval of the same, their decision not to participate therein, and in their conduct of crossing picket lines and reporting for and remaining at their work. They at no time left their jobs, nor did their unemployment result from any freely exercised choice in the course of the dispute; they neither shared in the strike vote nor performed any overt acts that would place them in league with the strikers. Their loss of work was due solely to factors over which they had neither control nor influence. The dispute resulting in the strike was one between Chrysler and the production and maintenance workers relating solely to the "rates of production" provisions of their contract; the dispute in no way affected the office and clerical workers and engineers and they them-

selves had no economic or other grievance with Chrysler. In the course of the dispute the executive board recommended to the production and maintenance workers that they take a strike vote; only they had the right to vote and only they voted; the office and clerical workers and engineers however voted their disapproval of the strike and not to participate therein. When the International Union approved the strike, the production and maintenance workers walked off the job. As in the matter of the dispute, neither did the office and clerical workers and engineers have any personal interest in the strike or its outcome, nor did they display any union sympathy or interest therein, crossing union picket lines and reporting for work. The terms of the settlement concluding the strike related solely to rates of production affecting only the production and maintenance workers; the settlement in no way directly affected or benefited the office and clerical workers and engineers, nor is there evidence in the record that the strike was called to benefit the entire union. This was not an industry-wide strike. Their only interest appears to have been not in the outcome of the strike but a general one in seeing the strike settled so they could return to their jobs.

In defending the lower court judgment, respondent first contends that the union called a strike of only the production and maintenance workers, and not of the office and clerical workers and engineers, as a matter of strategy; and that the "lay-off" was an exertion by the union against Chrysler of severe economic pressure in order to settle the dispute, attempting to bring the case within the holding of *McKinley* v. *California Emp. Stab. Com.*, 34 Cal.2d 239 [209 P.2d 602]; *Gardner* v. *State*, 53 Cal.2d 23 [346 P.2d 193], and *Chrysler Corp.* v. *California Emp. Stab. Com.*, 116 Cal.App.2d 8 [253 P.2d 68], which limits the "volitional" test of *Bodinson Mfg. Co.* v. *California Emp. Com.*, 17 Cal.2d 321 [109 P.2d 935], by refusing to extend qualification for unemployment benefits to nonstriking members who became unemployed by virtue of a strike called for the benefit of all members in which strategy or economic pressure was utilized. We find no evidence of subterfuge or union strike strategy, nor has respondent pointed out any technical move. The reason for the union's not calling a strike of the office and clerical workers and engineers was far removed from strategy or union maneuver—it had no control of the situation for under their contracts with Chrysler, the office and clerical workers and engineers had

no right to strike; moreover they had no interest in either the dispute or the strike and in the only way they could, voluntarily protested against the strike by disapproving the same, voting not to participate therein, crossing picket lines and reporting for work. Respondent's argument that the lay-off was an exertion of economic pressure by the union fails to take into account the realities of the situation—their number was so small as to constitute the office and clerical workers and engineers but a very minor factor in the overall picture.

However, respondent's last contention—that inasmuch as the union, which the office and clerical workers and engineers voluntarily joined, was designated under the by-laws as their general agent for all purposes, the action of union officials in calling the strike of the production and maintenance workers was, in fact, the act of each member of the union—deserves serious consideration. It argues that mere membership in a union striking against a common employer imposes an equal liability on all members, under the broad principles of the law of agency, citing as controlling a Pennsylvania case, *Prentice* v. *Unemployment Comp. Board of Review*, 161 Pa. Super. 630 [56 A.2d 295]. Respondent's argument is predicated mainly on the fact the office and clerical workers and engineers voluntarily joined the union and had an equal part in electing their union officials who, under the by-laws, were authorized to act for them as their agents. It is a fact that the union became their collective bargaining agent simply by virtue of their membership in the union, but it is pure fiction that they chose or could, or did, exert any influence or control over their union officials, for their voting strength was nil compared to the great majority of membership. *Prentice* v. *Unemployment Comp. Board of Review*, 161 Pa. Super. 630 [56 A.2d 295], interprets a Pennsylvania statute similar to the California Act. Approximately 50,000 rank and file miners of the United Mine Workers of America (UMW) became unemployed as the result of an industry-wide strike called against their common employers by the supervisory workers of the United Clerical, Technical and Supervisory Employees' Union (UCT), a separate division of UMW. The purpose of the strike was to force the coal operators to recognize the UCT as the bargaining agent of its members. The strike of the UCT was authorized by the International officers of the UMW. When the strike was settled the rank and file miners returned to work upon orders of the president of the

UMW. The court predicated its holding that claimant (and all other rank and file miners he represented) was disqualified from benefits, on the fact that he "entered into membership in his union (UMW) *of his own volition* because he felt that his best financial interests would be served thereby" (p. 300 [56 A.2d]), that by his vote he delegated authority to common union officials to act for him lawfully within the scope of the union objectives, making them his agents, binding him with their acts, that the union officials did not disapprove of or seek to prevent the strike, thereby authorizing the same, and that, because they were his agents, claimant shared responsibility for the strike of another division of the union, rendering his unemployment voluntary within the meaning of the Act. The court said that "[c]laimant's unemployment was brought about as a direct result of his chosen method of collective bargaining" (p. 300 [56 A.2d]).

In some respects, the *Prentice* case is similar to the one at bar, but there are also certain distinguishing features rendering it less than controlling authority here. In the *Prentice* case, the nonstriking members, through their union officials, could have prevented their fellow members from striking but took no action even to express disapproval of the strike, whereas here, the office and clerical workers and engineers could not have prevented the strike, having had no vote thereon and little or no influence in the election of union officials, and protested in the only way they could—by voting, among themselves, disapproval of the strike and no participation therein, and executing their choice by crossing union picket lines and reporting for work. In the former case, an industry-wide strike, directly affecting the status and power of the UMW as a whole, was involved and the suspension of work was by their union representatives "obviously approved for their [rank and file miners'] ultimate benefit" (p. 300 [56 A.2d]); in the case before us, only one unit of one local struck and there was no strike benefit to the office and clerical workers and engineers nor did union officials ever pretend there to be. Although the court in the *Prentice* case held that whether the miners would benefit by the outcome of the strike was beside the point, it acknowledged that "their international officers considered it of distinct advantage to the UMW" (p. 300 [56 A.2d]). In the *Prentice* case, the rank and file miners of the UMW were ordered back to work, not by their employers, the coal operators, but by the president of the

UMW, indicating that the strike of only the supervisory employees of the UCT was a matter of strategy by the UMW; in the light of our previous discussion it can hardly be said the strike of the production and maintenance workers was a matter of strategy designed to benefit the entire union membership.

But without regard to these factors, the broad application of the rule of agency found in *Prentice* v. *Unemployment Comp. Board of Review*, 161 Pa. Super. 630 [56 A.2d 295], holding that mere membership in a union authorizing a strike against an employer imposes equal liability for such strike action on all members of the union, including the nonstrikers, appears to be wholly incompatible with the "personal responsibility" view taken by courts in this jurisdiction. The Supreme Court in *Bodinson Mfg. Co.* v. *California Emp. Stab. Com.*, 17 Cal.2d 321 [109 P.2d 935], establishing the "volitional" test, speaks of qualification for unemployment benefits of one prevented from working through "no act of his own" (p. 327), and relates personal responsibility for his unemployment to an act he himself committed—one over which he had a free choice. In *Bunny's Waffle Shop, Inc.* v. *California Emp. Com.*, 24 Cal.2d 735 [151 P.2d 234], the court held it proper to relate responsibility for work stoppage to the party who created its actual impelling cause. *McKinley* v. *California Emp. Stab. Com.*, 34 Cal.2d 239 [209 P.2d 602], held that the "unemployment of the bakery workers was caused by their own action taken with full knowledge of its consequences" (p. 244); and in *Chrysler Corp.* v. *California Emp. Stab. Com.*, 116 Cal.App.2d 8 [253 P.2d 68], the court, discussing the "volitional" test, stated that the "criteria for denial or awarding of benefits being [was] the personal responsibility of the claimant for his unemployment in the former case" (p. 15). These cases hold generally that a claimant is not disqualified under the act as having voluntarily left his work unless he bears some personal responsibility for his unemployment; and in each, the act or conduct or interest in the dispute placing claimant in league with the strikers was one directly related to the impelling cause of the unemployment. No importance was laid on the fact of membership in the union; personal responsibility was contemplated as the criteria. This principle appears to eliminate *mere* union membership as either the "impelling cause of the unemployment" (the strike), or sufficient to make a nonstriking member responsible

for the act of his union officials in calling a strike of other members, under circumstances where he had no interest in the dispute, derived no strike benefit, had no control over the strike and did no act or engaged in no conduct relating to the same. *McKinley* v. *California Emp. Stab. Com.*, 34 Cal.2d 239 [209 P.2d 602], disqualified bakery workers under the act because their unemployment "was caused by their own action taken with full knowledge of its consequences" (p. 244) ; but involved was union strategy or a maneuver which resulted in a lockout, a single contract negotiated for *all* members including the nonstriking claimants, a benefit by all members from the settlement of the strike, and a strike vote, in which they all participated, authorizing the strike. The object sought to be accomplished by the strike in *Gardner* v. *State*, 53 Cal.2d 23 [346 P.2d 193], was a change in the *master* collective bargaining agreement affecting *all* employees. Therein, too, was union strategy by implementation of a strike against less than all employees. Likewise in *Chrysler Corp.* v. *California Emp. Stab. Com.*, 116 Cal.App.2d 8 [253 P.2d 68], was a concert of action between striking and nonstriking members and a definite identity of interest in the dispute. Only the production and maintenance workers of Local 230 participated in the strike although the office workers, who then under their contract could strike, voted to strike if necessary. The strike was concluded with Chrysler and Local 230 agreeing to new contracts for *all* units which resulted in new contracts for the office workers as well as the production and maintenance workers. Unlike in the case at bar in which the dispute was strictly one of the production and maintenance workers, each member of Local 230 regardless of unit, had a direct interest in the outcome of the strike; the contracts negotiated in behalf of each bargaining unit, as a prelude to the termination of that strike, contained changes which were practically identical in terms and resulted in similar benefits; the office workers were, in fact, directly involved and directly interested in the dispute, the strike and its outcome (the demand for a revision of the contracts of employment between Chrysler and all categories of its employees was the crux of the dispute) ; and as policy strategy the national leadership of the UAW called a strike of production workers only, although the office workers voted to conform to this decision and in so doing were fully aware that the strike would stop work. Reciting the purpose and intent of the act, analyzing the direct

cause of the unemployment, and predicating its decision on an identity of interest and concert of action between the office workers and production and maintenance workers, the court found personal responsibility in the office workers for the work stoppage and held their unemployment resulted from "the fact of volitional action." Said the court at page 17: "In participating in the events leading up to the strike, in supporting the tactical decisions made by their union officials empowered to conduct negotiations and formulate strike policy, in acting in concert with the production workers at all stages of the controversy, and, through identical union representatives, permitting the use of the production workers' strike as an instrumentality for the effective implementation of the overall strike strategy, it is manifest that the union office claimants were protagonists in a struggle involving a calculated risk of paralyzing petitioner's operations before the new contracts, of which they would be beneficiaries, would be consummated. That this identity of interest and concert of activity between union office and production workers was indeed a vivid reality unmistakably appears from a bulletin which was placed in evidence. The bulletin was issued by the executive board of Local 230 and circulated at the main gate of petitioner's plant." (*Chrysler Corp.* v. *California Emp. Stab. Com.*, 116 Cal.App.2d 8 [253 P.2d 68].)

If, under their approach to the California Unemployment Compensation Act, mere membership in the union had alone been sufficient to render nonstrikers personally responsible for the act of their union officials in sanctioning a strike of other members, there would have been no necessity for the courts to go into the vital matters of strike strategy, voluntary concerted action, identity of interest, joint activity, or subterfuge which violates the substance of the act, or to analyze the impelling cause of work stoppage. Dictum in *Barber* v. *California Emp. Stab. Com.*, 130 Cal.App.2d 7 [278 P.2d 762], would indicate that membership in the union alone is not sufficient to disqualify a claimant under the act. In any event we find nothing in any California authority pointing to such an interpretation of justifying such a holding.

Nor is the argument that having theretofore accepted the advantages and benefits of union membership the office and clerical workers and engineers must now accept its disadvantages, a compelling one, for it was not their membership in the union that was the impelling cause of their unemployment

but the strike, over which they had no control. Further, they left their work not because of the dispute between Chrysler and the production and maintenance workers but in the course of the dispute. And the Supreme Court, interpreting section 1262, has made a distinction "between leaving in the course of a trade dispute and leaving because of a trade dispute. ■■ The act does not disqualify an employee from receiving benefits in all cases where his unemployment results directly or indirectly from a labor dispute, but makes him ineligible only if he left his work because of the dispute. There must therefore be a direct causal connection between the trade dispute and the leaving of work. It is conceded that when claimants ceased work, a trade dispute between the unions and employers was in active progress, but this fact alone does not necessarily establish that the leaving was because of the trade dispute . . . The fact that the trade dispute was unquestionably the motivating cause of the employers' acts does not establish any direct causal relation between the dispute and the employees' leaving of work. (See *Rhea Mfg. Co.* v. *Industrial Com.*, 231 Wis. 643 [285 N.W. 749, 753].)'' (*Bunny's Waffle Shop, Inc.* v. *California Emp. Com.*, 24 Cal.2d 735, 740-741 [151 P.2d 234].) The dispute existed and the resultant strike was in active progress some time before the office and clerical workers and engineers were laid off by respondent. They continued to work a week after the strike commenced and resumed a week before it ended; they did not leave their work in the sense that they walked off the job and refused to return but were laid off by their employer.

We realize the significance of certain social or economic problems relative to the maintenance of the fund by the employer but consider them not a matter for the court (*Bodinson Mfg. Co.* v. *California Emp. Com.*, 17 Cal.2d 321 [109 P.2d 935]); proper resort to the Legislature might well result in changes similar to those placed in the Pennsylvania statute after the decision in the *Prentice* case.

For the foregoing reasons the judgment is reversed.

Wood, P. J., concurred.

FOURT, J.—I dissent.

It is my opinion that the trial judge in this case properly disposed of the matter.

It is to be remembered that all of those who were em-

ployed at the Los Angeles plant of the respondent (insofar as this case is concerned) were members of the same local union, consisting of three units: namely, the office and clerical workers, the engineers, and the production and maintenance workers. Each member of each unit took the same oath upon becoming a member, paid the same dues, had the same right to participate in the election of and was governed by the common local officers of the union. The three contracts for the units which were made by the union with the company were substantially the same. The contract with reference to the production and maintenance workers did not prohibit the calling of a strike over rates of production.

The executive board of the local union recommended that a strike vote be taken by the production workers unit. The board was made up principally of the officers of the union who had been elected by all of the members of the union. After approval was secured from the International Union the strike was called and as an inevitable result of the strike which was called, the applicants in this case (office and clerical workers) were laid off.

The by-laws and the constitution of the union provide in effect that the union is the exclusive collective bargaining representative of all of the members. The union acts irrevocably as the agent of each member and has the sole power to bind such members in the prosecution of all disputes with reference to the relationship between the members and the company.

The trial judge found in part as follows: (1) claimants were laid off as a direct consequence of the strike, (2) the resultant lay-off was reasonably foreseeable, (3) the claimants were directly interested in the trade dispute which gave rise to the strike, (4) the members of the union, including the applicants, acquiesced in all acts of the union in connection with the trade dispute, (5) the members, including the applicants, acceded to and were bound by the actions of their representatives in the union, (6) the claimants were voluntarily unemployed, and (7) that all of the allegations of the respondents' amended petition were true.

As I view it no one of the three groups of the union was insulated from the other. They worked together, each received the same benefits from the union and I believe each should share the responsibilities of the union. In other words, a member of the union, under the circumstances of this case,

ought to be bound by the course which is taken by his duly constituted and elected agents, namely the officers of the union.

If the officers of a union call a strike, by the very nature of events all of the members of the union are affected thereby in some way, whether they actually participate in picket lines or do otherwise. It was inevitable that all of the members of the union in question would ultimately be laid off if those who produced the product were out on strike. Each member of the union contributed to the strike fund and each had a vital interest in the strike and the outcome thereof. The contributions were made to the strike fund by the applicants in part with the hope or expectation that the company would ultimately be compelled in the case of a strike to comply with the demands of the union.

It would seem a fact of life that where, as here, there is a single union in a single plant of a company, and the union is successful in one division of its activities, ordinarily it becomes easier for the union to settle and dispose of some other or similar problem or problems in another division of its activity in the same plant. The success or failure of a union is not necessarily based upon an immediate acceptance of all of its demands upon all fronts simultaneously.

There was nothing to stop the claimants in this case from participating in the moves of the union preliminary to the calling of the strike. Indeed they were very active in such endeavors.

It is clear that it was a part of the union strategy in its dealings with the company to proceed as it did. The union undoubtedly felt that if it could deal with one segment of the company's business and get all that it demanded, it would be simple to apply the same procedure regarding other matters such as wages, to other segments of the same business.

In this case the claimants were part and parcel of the union which called the strike. The union deliberately maneuvered the situation to the point where the work had to stop. The act of the union shut down the plant. It was the union which wanted to and did change the status quo. Can it reasonably be said that the applicants here were unemployed *through no fault of their own*?

The applicants knew when they joined the union that the union would thereafter speak for them in any contract negotiations and otherwise—they knew that the union could and might call the very strike which it did call and that if such a

strike were called they would be out of work; further the applicants agreed to and did voluntarily contribute to the strike fund of the union. The agents (the union representatives) of the applicants themselves in effect put the applicants out of work. There was no intervening cause. There can be no doubt that the applicants in a very real sense had a financial interest in the strike and in the outcome of the strike in more ways than one.

Section 1262 of the Unemployment Insurance Code reads as follows:

"§ 1262. [*Strike; ineligibility.*] An individual is not eligible for unemployment compensation benefits, and *no such benefit shall be payable to him, if he left his work because of a trade dispute.* Such individual shall remain ineligible for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed."

A literal reading of the statute in question presents little if any problem. What has created a very serious problem, however, is the interpretation put upon the words of the statute by courts which have determined in effect to make or establish social policy. Courts little by little have added to or subtracted from the definitions of the words contained in the statute until now it is difficult to recognize the plain simple language of the statute from the decisions.

The applicants in this case are not in any sense the *innocent victims* of a trade dispute between a union and an employer. The applicants and each of them had a free choice in their determination as to whether or not they would go to work for Chrysler—they (each) also had the right in the first instance to decide their own fate but they transferred that right to the union, and the union called the strike.

I cannot attribute to the Legislature that it intended to adopt a statute which in effect (as interpreted by the majority of this court) would provide that strikes should in any part be financed out of unemployment insurance compensation funds —particularly so when the real reason for the statute in the first instance was to alleviate economic insecurity resulting from involuntary employment. (See 28 A.L.R.2d 287.)

My reading of the history of the unemployment insurance statute leads me to believe that it was never contemplated that industry and the public would be required to finance large numbers of workers who were out of work because their union

was out on strike. The bargaining strength of the union is greatly strengthened by the majority opinion in this case and in my view places the state and the court in a position which is anything but neutral. If it is anticipated ultimately to abolish for all intents and purposes the disqualification provisions of the statute then this case is indeed a long step in that direction.

In short this court now holds that a company can be compelled to finance in part a strike against itself. The company has incurred a further loss through added payroll taxes as its rating falls and the fund itself is reduced for those who are honestly entitled to participate in benefits.

The majority opinion completely disregards the evidence in this case and the rule of law to the effect that if there is substantial evidence to support the findings of fact of the trial court an appellate court will not interfere.

It is easily apparent from the facts of this case that the union determined the entire strategy for the whole strike in this case far in advance of the calling of such strike. The officers who made the determination to strike were in the position of power in part because of the applicants. The officers in their action were acting for and in behalf of the members, the applicants.

It has been argued from time to time that the labor dispute disqualification provisions of the statute should be abolished. If the argument is sound then it should be done by the Legislature and not by court decisions.

The majority opinion opens the doors wide for the "key man" strike and for all other employees of a plant so struck to receive unemployment insurance.

A thorough reading of *Prentice* v. *Unemployment Comp. Board of Review*, 161 Pa. Super. 630 [56 A.2d 295], will disclose that the court interpreted a Pennsylvania statute very similar to the statute in question. The result in the Pennsylvania case was exactly the opposite to the result reached by the majority here.

I would affirm the judgment.

A petition for a rehearing was denied February 21, 1962. Fourt, J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied March 28, 1962. McComb, J., was of the opinion that the petition should be granted.