43 N.J. Super. 196 (1957)
128 A.2d 15
ELEANOR MYERSON, APPELLANT,
v.
BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, DEPARTMENT OF LABOR AND INDUSTRY, STATE OF NEW JERSEY, AND FEDERAL TELEPHONE & RADIO CORP., RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 10, 1956.
Decided January 2, 1957.
*198 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. C. Robert Sarcone argued the cause for appellant (Mr. Joseph Schoenholz, on the brief).
Mr. Clarence F. McGovern argued the cause for the Board of Review.
The opinion of the court was delivered by CLAPP, S.J.A.D.
This is an appeal from a decision of the Board of Review denying unemployment compensation. On March 2, 1956 the Federal Telephone & Radio Corp., which had employed the claimant, Mrs. Eleanor Myerson, for 13 years, required her to discontinue work because of pregnancy. The collective bargaining agreement between Federal and the union to which she belonged, provides:
"An expectant mother shall be entitled to a leave of absence for not more than a year without pay. In no case shall an expectant mother be permitted to work beyond the end of the fifth month of pregnancy." *199 Several days before Mrs. Myerson was laid off, her doctor made a statement in writing (presumably for her to hand to her employer) declaring that her child was expected in four months, namely, on July 1, and that she was capable of working until June 1. That statement was in no way questioned by the agency. It should be noted that her job with Federal, as an assembler, solderer and wire stripper, called merely for the use of her hands while she was seated.
The Unemployment Compensation Law contains no provision expressly disqualifying a claimant from receiving benefits for any period during pregnancy. Compare the Temporary Disability Benefits Act, N.J.S.A. 43:21-39 and 43:21-4(g) (2), which denies benefits "for any period of disability due to pregnancy." However, the latter act (it may be noted parenthetically) is itself to be contrasted with the unemployment compensation laws in 17 states, which provide a disqualification period extending for a specified period of time before childbirth, as follows: Connecticut, 2 months; District of Columbia, 6 weeks; Idaho, 6 weeks; Illinois, 13 weeks; Kansas, 2 months; Louisiana, 12 weeks; Maine, 8 weeks; Maryland, 2 mouths; Massachusetts, 4 weeks; Nebraska, 12 weeks; North Carolina, 3 months; North Dakota, 12 weeks (the disqualification may be eliminated if claimant submits a doctor's certificate or a work record during previous pregnancies); Oklahoma, 6 weeks; Oregon, 6 weeks; Pennsylvania, after 7 1/2 months of pregnancy; Utah, 12 weeks; Washington, 10 weeks. See Commercial Clearing House Service, Unemployment Compensation Law.
In New Jersey, as indicated, there is no such statutory provision. However, the Board of Review believed Mrs. Myerson's claim was barred by Glover v. Simmons Co., 17 N.J. 313 (1955). The Board's theory was that the claimant may be said to have entered into the foregoing collective bargaining agreement herself since it was made by her agent, the union; and therefore that the unemployment following March 2 was voluntary, and hence noncompensable. See Rzepski v. Unemployment Compensation Board of Review, *200 182 Pa. Super. 16, 124 A.2d 651 (Super. Ct. 1956). The fact situation in Glover was quite different. There the court was concerned with a collective agreement made by claimant's union with claimant's employer, which called for certain vacations for employees with one or more years of service and also authorized the company to shut down the plant for a two-week vacation period. This meant a layoff for two weeks without pay in the case of employees, including claimant, whose term of service was less than one year. Under the circumstances, as the Supreme Court held, claimant was not entitled to unemployment benefits.
The Board in the instant case seems to look upon Glover as authority for the general proposition that any unemployment caused by a collective bargaining agreement between claimant's union and the employer is voluntary and, accordingly, without the purview of the Unemployment Compensation Law. This, we think, is error. That proposition, in fact, had been espoused by the Appellate Division in Campbell Soup Co. v. Board of Review, 24 N.J. Super. 311 (App. Div. 1953), but the Supreme Court reversed, 13 N.J. 431 (1953), rejecting it squarely. In Campbell, the courts were dealing with a collective bargaining agreement, made by claimants' union, which required employees to retire at age 65. Notwithstanding the agreement, the Supreme Court held by a vote of 6 to 1 that the unemployment thus brought upon claimants at age 65 "was involuntary in the statutory sense" (13 N.J., at page 435) and entitled them to unemployment benefits. The court asserted unequivocally:
"The fact * * * that the claimants through their agent, the union, voluntarily subscribed to the contract is * * * unimportant * * *."
It must be remembered that in reality the unemployment was not voluntary on the part of the particular claimants. The court went on to say that there is a "general public interest" (13 N.J., at page 436) in the distress caused by unemployment, which induces the law to allow benefits even *201 though the unemployment comes about through the medium of a union contract. Some measure of support for this position was found in N.J.S.A. 43:21-15, which invalidates agreements of an individual attempting to waive the unemployment benefits provided by the law.
Glover, of course, did not overrule Campbell. It has been suggested that the distinction between Glover and Campbell is that in Campbell the employment relation between the claimants and their employer was severed permanently at age 65; while in Glover it "remained intact" (17 N.J., at page 320). But there is nothing to this. Unemployment compensation is not to be denied persons merely because the employer or the collective bargaining agreement designates a period of unemployment as a leave of absence. Cf. the definition of unemployment found in N.J.S.A. 43:21-19(m)(1). Hence the fact that Mrs. Myerson here was given a leave of absence, with seniority rights and other privileges protected, is not determinative of the case.
Glover took pains to distinguish Campbell, not on the ground that in Glover the employment relation remained intact, but on a rather narrow ground (17 N.J., at page 321). The Campbell rule still obtains, namely, that unemployment brought upon certain workers as a result of a contract made by their union, does not, just because of the contract, become voluntary in character so as to deprive them of unemployment compensation. It therefore cannot be said  looking at specific clauses of the act  that in that situation the workers either intend not to work or are not "available for work" (N.J.S.A. 43:21-4(c)) or "of their own volition" (13 N.J., at page 435) have quit work (N.J.S.A. 43:21-5(a)). Cf. Comment, "Right to Unemployment Compensation as Affected by Union-Management Retirement Agreements," 53 Mich. L. Rev. 849 (1955); Comment, "Unemployment Compensation: Voluntary Unemployment: Effect of Collective Bargaining Agreement," 2 Ill. L. Rev. 389 (1949); Teple, 10 Ohio State L.J. 191, 200 (1949).
*202 However there are cases where the union contract produces a kind of unemployment not within the contemplation of the law, and Glover is one of those cases. It is to be noted that the contract itself is a factor in the decision there. Glover does not hold that an employer who adopts a vacation plan, like that adopted there, can rid himself of his obligation to pay unemployment benefits to those with less than one year's service, where he imposes the plan on the employees without the consent of their union. That question was not decided.
But, in addition to the contract, there are other very important factors  three of them, as we see it  which enter into the Glover decision. First, the contract provided a vacation, a holiday, in the very interests of the workers. Second, it involved merely a "short" (17 N.J., at page 321) leave, a not "unreasonable economic hazard" (17 N.J., at page 322). Third, the resulting two-week layoffs without pay, to which some employees were thereby subjected, were but an incidental "part of the compensation plan involving the employees as a whole" (17 N.J., at page 321, italics added). The court in Glover  looking at the "internal sense" of the law (17 N.J., at page 319)  held that the unemployment there was not the type of hazard with which the law was concerned.
Is there some sort of a parallel here? Can it be said that the collective bargaining agreement which caused Mrs. Myerson to be unemployed from March 2 to perhaps (as her doctor predicted) June 1, a matter of three months while she was still able to work, created in her own interests a reasonable "economic hazard" (17 N.J., at page 322); and that, if looked upon as a phase of childbirth, it is not the sort of hazard  that is, it is not the kind of unemployment  that the Unemployment Compensation Law was aimed at? As in Glover, we are concerned here, not with the specifics of any one provision in the law (such as N.J.S.A. 43:21-4(c) or 43:21-5(a)), but with the internal sense of the whole act. There is a very fundamental principle to be borne in mind in this connection, and that is this: the *203 courts should be hesitant to cut down the scope of a statute because of their own view as to its internal motivations, except where there is some fairly clear justification for so doing. Singer Sewing Machine Co. v. New Jersey Unemployment, etc., 128 N.J.L. 611, 616 (Sup. Ct. 1942), affirmed 130 N.J.L. 173 (E. & A. 1943). Particularly should this be so when the effect would be to reduce the coverage of an act such as the Unemployment Compensation Law, which (Bergen Point Iron Works v. Board of Review, 137 N.J.L. 685, 686 (E. & A. 1948)) we are enjoined to construe liberally in favor of the claimant when we are in doubt as to its purport.
Can we say, then, that it is fairly clear that Mrs. Myerson's unemployment possibly for three months was part of a plan adopted primarily in the interests of the employees and, moreover, that it was a reasonable economic hazard? We have no means of knowing whether in the present case the five months' rule appearing in this contract was sponsored by the employer or by the union, nor are we advised as to the underlying reasons for that rule. The company does state for the record that the rule represents "company policy." But we put no great stress on that casual assertion. Was this rule designed principally in the interests of mother and child, that is, in the interests of health; or, on the other hand, was it intended chiefly to serve the important interests of the company, that is, inter alia, to forestall an anticipated fall-off in a worker's industrial productivity after the fifth month of pregnancy?
We cannot take judicial notice of these matters, and we are not aided by the proofs here. However, we may note (though we express no opinion on the matter) that it is said that while medical authorities commonly recommend a prenatal leave of absence of six weeks, there is
"`no convincing evidence that employment up to the time of delivery is harmful provided the physical condition of the woman is satisfactory and the work is suitable'" (Author's emphasis). Altman, Availability for Work 226 (1950).
*204 The "better opinion," says Altman, is to allow the matter to be determined in each case as it arises, not according to a rigid rule (such as the five months' rule here) but according to the nature of the work, the woman's physical condition and the other circumstances presented by the case. Only five states prohibit employment of pregnant women in factories and other specified establishments, and then only for the following periods prior to childbirth: Connecticut, 4 weeks; Massachusetts, 2 weeks; Missouri, 3 weeks; Vermont, 2 weeks; Washington, 4 months. See Altman, 286. These statutes and the provisions of the Unemployment Compensation Laws, above cited, which fix periods of disqualification in case of pregnancy, furnish an interesting study in comparative legislation. The former statutes provide, generally speaking, for noticeably shorter periods than the Unemployment Laws, and it may perhaps be deduced from that fact that the Unemployment Laws in this respect take into account something other than society's concern in the worker's health. In any event, we think  having regard for our own limited power to take judicial notice  that it can hardly be said to be fairly clear that Mrs. Myerson's unemployment from March 2 on (her child was expected July 1) was caused by the union contract chiefly in the interests of herself and her health.
It is to be noticed, too, in dealing with the reasonableness of the hazard, that the period of unemployment involved in Glover ran merely for two weeks. Here the period during which the claimant may have been able to work, may have lasted three months  that is, from March 2, 1956 to (according to claimant's doctor) June 1, 1956. This three months' period obviously falls in between the two-week period dealt with in Glover and the plan for compulsory retirement at age 65 with which Campbell was concerned. A two-week vacation period can be dismissed as a reasonable "economic hazard" (17 N.J., at page 322). But can the same be said of a period of unemployment lasting three months?
With these various considerations in view, we come back to the question above posed. A two-week period of *205 unemployment, which entails, as we say, no tremendous economic hazard, which was designed in the employees' interest generally, and which not only is compelled by a union contract but, more than that, forms a part of the compensation plan involving the employees as a whole (and indeed works to their substantial benefit, at least if they remain with the company permanently) may be said to be fairly clearly beyond the purview of the law, if one looks at its internal sense. That period of unemployment may perhaps be regarded as little other than a vacation. But the instant case presents another matter. For it cannot be said with any sense of assurance that the unemployment, brought on by the union contract here, which was to continue for a substantial period, perhaps three months while claimant was still able to work, is so short a respite from work, so plainly in the worker's interest and so reasonable an economic hazard, as to warrant the conclusion that it is beyond the scope of the statute.
In reaching our conclusions here with respect to Glover, we have in no way taken into account the amendment to N.J.S.A. 43:21-19(m)(1) enacted by L. 1956, c. 65, effective June 6, 1956. See BR 36930-E; cf. Note, "Disqualification for Unemployment Insurance," 8 Vanderbilt L. Rev. 307, 319 (1955).
Reversed, and remanded. The extent of the benefits payable will have to be determined by the agency.