[Civ. No. 22338. First Dist., Div. One. Aug. 4, 1965.]

PACIFIC MARITIME ASSOCIATION et al., Plaintiffs and Appellants, v. CALIFORNIA UNEMPLOYMENT IN-SURANCE APPEALS BOARD et al., Defendants and Respondents; SAILORS' UNION OF THE PACIFIC et al., Interveners and Respondents.

Richard Ernst, Peter B. Spruance, G. L. Munter, Jr., Morris L. Myers and Dennis T. Daniels for Plaintiffs and Appellants.

Thomas C. Lynch, Attorney General, and Clayton P. Roche, Deputy Attorney General, for Defendants and Respondents.

Jennings, Gartland & Tilly and John Paul Jennings for Interveners and Respondents.

SULLIVAN, P. J.—The main question confronting us in this case is whether a seaman who has terminated his employment as required by provisions of a collective bargaining agreement fixing limited tenure of employment under a system of job rotation is disqualified for unemployment compensation benefits because "he left his most recent work voluntarily without good cause" within the meaning of Unem-

ployment Insurance Code section 1256.[1] We hold that the employee did not thereby leave his employment voluntarily since at the time of his separation he did not in reality choose to quit. Nor do we believe he should be deemed to have left voluntarily on the theory that through the agency of his union he agreed to the contract provisions which eventually necessitated his displacement. We conclude that he is not precluded from receiving his unemployment benefits and that the judgment of the lower court upholding his eligibility to receive them should be affirmed.

This is an appeal by Pacific Maritime Association, Matson Navigation Company and Oceanic Steamship Company (hereafter referred to as the Association, Matson and Oceanic respectively) from a judgment denying their petition for a writ of mandate, and discharging an alternative writ of mandate, directing respondents California Unemployment Insurance Appeals Board and the named members thereof (hereafter referred to collectively as the Board) to reverse and set aside its decision[2] upholding the granting of unemployment compensation benefits to claimants Sexton and Boykin and directing the Board and respondent Albert B. Tieburg, Director of the Department of Employment, to remove all charges to petitioners' reserve accounts made on the basis of the claims of said claimants and to make no similar charges on the basis of similar claims. Pursuant to stipulation of the parties and order of the court below, the Sailors' Union of the Pacific, the Marine Cooks and Stewards Union and the Marine Firemen's Union, comprising the Pacific District of the Seafarers' International Union of North America, AFL-CIO (hereafter referred to collectively as the Unions) filed in the court below a complaint in intervention praying that the petition be dismissed.[3]

*The instant action (No. 536996 below)*

The facts are not in dispute. Pacific Maritime Association represents employers in the maritime industry, including Matson and Oceanic, in negotiating, executing and admin-

[1]Hereafter unless otherwise indicated all code references are to the Unemployment Insurance Code.

[2]*In the Matter of Sexton and Boykin,* Benefit Decision No. 6720, Appeals Board Case No. 63-1676.

[3]Said interveners also filed an answer to the petition. The Board and the director of the department filed a return to the alternative writ by answer to the petition.

istering collective bargaining agreements with the Unions. Claimant Edward R. Sexton was actively employed as a seaman by Matson until his employment terminated on January 2, 1963, and claimant Sam H. Boykin as a seaman by Oceanic until his employment terminated on February 21, 1963. Both men were members of a pool of unlicensed seamen represented by the Unions. In each instance, the seaman's employment was terminated solely because of limited tenure provisions contained in the pertinent collective bargaining agreements entered into between the maritime employers and the maritime unions. At all material times the Unions were the duly certified collective bargaining representatives of the seamen.

Both claimants filed claims for unemployment compensation benefits with the Department of Employment which ruled that neither man was subject to the disqualification of section 1256 and that their employers' reserve accounts were not relieved of benefit charges under section 1032.[4] The employers filed notices of appeal to a referee of the Department of Employment, who upheld the lower administrative decisions in a consolidated proceeding. Another appeal to respondent Board led to another affirmance.

As the trial court found, the abovementioned limited tenure provisions were first made a part of the pertinent collective bargaining agreements beginning on or about January 1, 1959.[5] Prior to 1959, there had been in existence unilateral rules adopted by the Unions which provided for distribution of available work among their members. However, the court found that when such rules were unilateral, the employer was not required to terminate the seaman when his time was up nor was the seaman required to leave his employment, if still

[4]Section 1032 provides: ''If it is ruled under Section 1030 or 1328 that the claimant left the employer's employ voluntarily and without good cause or was discharged by reason of misconduct connected with his work, benefits paid to the claimant subsequent to the termination of employment due to such voluntary leaving or discharge which are based upon wages earned from such employer prior to the date of such termination of employment, shall not be charged to the account of such employer unless he failed to furnish the information specified in Section 1030 within the time limit prescribed in that section.''

[5]Referred to in the findings as ''the limited tenure provisions of the bilateral shipping rules.'' The court found that they became part of the agreements between the employers and the following unions on the following dates: Marine Cooks and Stewards Union, January 1, 1959; Sailors' Union of the Pacific, February 9, 1959; Marine Firemen's Union, March 7, 1960.

available to him. Under the limited tenure provisions contained in the collective bargaining agreements, the tenure of employment was fixed according to classifications of employees determined on a basis of seniority.[6]

It is convenient at this point to note the disparate positions of the contracting parties with respect to the limited tenure provisions. Although petitioners do not question the validity or binding effect of any of the collective bargaining agreements, their position essentially has been, and is, that they opposed the demand of the Unions to include the limited tenure provisions in the agreements but finally agreed to their inclusion "involuntarily." They asserted below that the shipping rules limiting tenure of employment were both unnecessary and undesirable and in practical effect remained at all times a unilateral union rule.

*The prior action (No. 506224 below)*

On December 9, 1960, Pacific Maritime Association and seven of its members,[7] including Matson and Oceanic, petitioners herein, filed in the court below a petition for a writ of mandate seeking the same relief against the Board, its members and the Director of Employment as they do in the instant action except that the claims for compensation benefits were by different seamen covering different periods of unemployment. In such prior action, the Unions, interveners and respondents herein, filed a complaint in intervention in the same capacity and for the same reasons as they have done in this one. Indeed, without entering upon a detailed comparison of the petitions, it is sufficient to say that except for the names of the claimants and the pertinent dates, the allegations of the petition in the prior action are practically the same as those of the petition in the instant one.[8] It is also sufficient for our present purposes to mention that in the prior action, petitioners alleged that they "agreed in the give

---

[6]Sexton, who held a "Class B" seniority rating under the Sailors' Union of the Pacific agreement was entitled thereunder to remain aboard ship for 60 days or for one trip, whichever was longer. He was required to terminate his employment after 60 days. Boykin, who held a "Class A" seniority rating under the Marine Cooks and Stewards agreement, was required thereunder to get off the vessel after completing a voyage during which he had completed 360 days of continuous employment. He was required to terminate his employment after such period of time.

[7]American President Lines, Ltd., Grace Lines, Inc., Matson Navigation Company, Oceanic Steamship Company, Pope & Talbot, Inc., States Steamship Company and Weyerhaeuser Steamship Company.

[8]Many of the allegations are word for word the same.

and take of collective bargaining'' to acquiesce in the demands of the Unions for limited tenure provisions, whereas in the instant action they allege that such provisions were ''agreed to involuntarily.'' It is apparent that in the prior action these petitioners raised the same issue of fact as they did in the instant one: whether the inclusion of limited tenure provisions in the same collective bargaining agreements was a mere involuntary ''acquiescence'' to the demands of the Unions rather than the voluntary act of all contracting parties.

In the prior action (No. 506224) the court found in substance that the limited tenure provisions of the collective bargaining agreements were agreeable to, and desired by, both the maritime employers and the Unions and that the employment of each claimant was terminated by his employer ''under and by virtue of the provisions of his respective collective bargaining agreements set forth and quoted'' in the petition. The court concluded ''That each of the seamen . . . did not leave his employer's employ voluntarily within the meaning of sections 1032 and 1256 . . . but left his most recent work involuntarily.'' Judgment was entered accordingly, denying the petition for a writ of mandate and discharging the alternative writ. No appeal was taken and said judgment became final.[9]

*Findings and conclusions in the instant action (No. 536996)*

As already mentioned, the trial court made findings as to the nature, purpose and effect of the limited tenure provisions of the bilateral shipping rules included in the collective bargaining agreements, their application to the specified claimants, and the termination of claimants' shipboard employment pursuant thereto. It was also found that essentially the same issues of fact and law were raised in the instant proceedings (No. 536996) as were raised and adjudicated in the prior proceedings (No. 506224). The court made alternate conclusions of law: (1) On the merits of the case, without consideration of the effect of the prior judgment in action No. 506224, it concluded that the decision of the Board

[9]It is to be noted that the administrative record in the *prior* proceeding which culminated in action No. 506224 below, together with the pleadings, findings of fact and conclusions of law, and judgment in said prior action, were received in evidence in the subsequent administrative proceeding (In the Matter of Sexton and Boykin) pertaining to the instant action (No. 536996) and are part of the instant record on appeal.

affirming the payment of benefits to the two claimants should be upheld; (2) as to the effect of the prior judgment, it concluded that petitioners herein were estopped thereby from relitigating (a) the issue as to whether or not their acquiescence in the limited tenure provisions of the bilateral shipping rules was voluntary or (b) the issue as to whether seamen who leave their work by virtue of such provisions, leave their work voluntarily or involuntarily. Finally, the court concluded that the specified claimants were not disqualified from receiving unemployment benefits and their employers' reserve accounts should not be relieved of charges therefor. Judgment was entered accordingly. This appeal followed.

As we indicated at the outset, the main question which we face is whether an employee who leaves work as required by the above limited tenure provisions incorporated in the pertinent collective bargaining agreements has left work "voluntarily without good cause." However, we must first decide whether petitioners can litigate this question at all in view of the prior judgment adverse to them in action 506224.

Respondents and interveners contend that the prior judgment is a conclusive adjudication of the question here in issue. ▉▉▉ The contention is grounded on the doctrine of collateral estoppel, the secondary aspect of the doctrine of res judicata, under which "A former judgment operates . . . in a later action upon a different claim or cause of action, . . . as an estoppel or conclusive adjudication as to such issues in the second action as were actually litigated and determined in the first action." (*Todhunter* v. *Smith* (1934) 219 Cal. 690, 695 [28 P.2d 916]; *Sutphin* v. *Speik* (1940) 15 Cal.2d 195, 201-202 [99 P.2d 652, 101 P.2d 497]; *Clark* v. *Lesher* (1956) 46 Cal.2d 874, 880-881 [299 P.2d 865]; *Taylor* v. *Hawkinson* (1957) 47 Cal.2d 893, 895-896 [306 P.2d 797]; *Louis Stores, Inc.* v. *Department of Alcoholic Beverage Control* (1962) 57 Cal.2d 749, 757 [22 Cal.Rptr. 14, 371 P.2d 758]; *Saunders* v. *New Capital for Small Businesses, Inc.* (1964) 231 Cal.App.2d 324, 330 [41 Cal.Rptr. 703]; *McDougall* v. *Palo Alto etc. School Dist.* (1963) 212 Cal.App.2d 422, 428 [28 Cal.Rptr. 37]; *Verdier* v. *Verdier* (1962) 203 Cal. App.2d 724, 739 [22 Cal.Rptr. 93].) ▉▉▉ "In determining the validity of a plea of res judicata three questions are pertinent: Was the issue decided in the prior adjudication identical with the one presented in the action in question? Was there a final judgment on the merits? Was the party against whom the plea is asserted a party or in privity with a

party to the prior adjudication?'' (*Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807, 813 [122 P.2d 892].)

It is apparent that all of the conditions of *Bernhard* have been met. First, although the instant action involves different claimants for benefits and different charges against petitioners' reserve accounts and is therefore ''upon a different claim or cause of action,'' petitioners in the instant action were parties to the prior adjudication. Secondly, the prior judgment is final and on the merits. Finally, the two issues decided in the prior adjudication are identical with those raised in the present proceeding. The first issue as to whether the limited tenure provisions of the collective bargaining agreements were agreed upon by both the employers and the Unions presented a question of *fact*. The second issue as to whether an employee who left his work as required by such agreements left voluntarily without good cause, being one of statutory interpretation as to what is meant by ''voluntary'' presented a question of *law*. (Cf. *Bodinson Mfg. Co.* v. *California Emp. Com.* (1941) 17 Cal.2d 321, 325 [109 P.2d 935].)

Section 70 of the Restatement of Judgments reads as follows: ''Where *a question of law* essential to the judgment is actually litigated and determined by a valid and final personal judgment, the determination is not conclusive between the parties in a subsequent action on a different cause of action, except where both causes of action arose out of the same subject matter or transaction; *and in any event it is not conclusive if injustice would result.*'' (Italics added.) Comment b to said section states: ''Where a question of law is actually litigated and determined in an action, the determination is *ordinarily conclusive* between the parties in a subsequent action *involving the same subject matter* or transaction, although based upon a different cause of action from that upon which the original action was based.'' (Italics added.) Comment f to said section states: ''The determination of a question of law by a judgment in an action is not conclusive between the parties in a subsequent action on a different cause of action, even though both causes of action arose out of the same subject matter or transaction, *if it would be unjust to one of the parties or to third persons to apply one rule of law in subsequent actions between the same parties and to apply a different rule of law between other persons.*'' (Italics added.) The courts have recognized the

foregoing qualification of the doctrine of collateral estoppel. (*Louis Stores, Inc.* v. *Department of Alcoholic Beverage Control, supra,* 57 Cal.2d 749, 757; *Thain* v. *City of Palo Alto* (1962) 207 Cal.App.2d 173, 185 [24 Cal.Rptr. 515].)

■ There is no doubt in our minds that the instant action involves the same subject matter as the prior one. The parties are the same; the collective bargaining agreements are the same; and the central legal issue is the same, namely whether termination of employment pursuant to such agreements constitute leaving work voluntarily within the compass of section 1256. ■ But we are also of the view that "injustice would result" should we hold that, by virtue of collateral estoppel, the adjudication of this issue in the earlier proceeding is conclusive between petitioners and the Unions. Whatever validity there may be to the Board's argument that if collateral estoppel is applied, all seamen and all employers herein will be treated the same, it is conceivable that similar limited tenure provisions may be incorporated in other collective bargaining agreements in industries *other* than the maritime industry.[10] In such event while these petitioners would be bound by the earlier determination that leaving work as required by such rules was not voluntary, other employers might sustain the thesis that it *was,* establish the disqualification of employee-claimants, and avert the impact of the statutes on their reserve accounts. It seems to us that this risk should be avoided and that we should determine whether termination of employment as required by such agreements falls within section 1256. We conclude that the doctrine of collateral estoppel is not operative as to the issue of law above noted and that the instant appeal should not be disposed of on that basis. We therefore reach the case on its merits.

The central issue which we now take up—whether termination of employment as required by a collective bargaining agreement by an employee otherwise personally willing to work is voluntary and within section 1256[11]—was before the

[10]Section 1256 is clearly of general application and indeed makes no mention of the maritime industry.

[11]Section 1256 provides in pertinent part: "An individual is disqualified for unemployment compensation benefits if the director finds that he left his most recent work voluntarily without good cause or that he has been discharged for misconduct connected with his most recent work.

". . . . . . . . . . .

"An individual whose employment is terminated under the compulsory

court in *Douglas Aircraft Co.* v. *California Unemp. Ins. Appeals Board* (1960) 180 Cal.App.2d 636 [4 Cal.Rptr. 723].[12]

In *Douglas,* the employer and the union entered into a collective bargaining agreement, ratified by the members of the union, containing provisions initially proposed by the employer which forbade the continued employment of any employee after the fourth month of pregnancy. The employee became pregnant and after working the permissible four months applied for and was granted a pregnancy leave of absence. Being willing and able to continue working for two more months, she sought employment elsewhere but without success. She applied for unemployment compensation benefits. Her employer objected on the ground that she had left her work voluntarily and without good cause and was therefore disqualified for benefits. The trial court granted a writ of mandate setting aside the benefits and the charges therefor against the employers reserve account on the basis that the employee, having agreed to the provisions of the collective bargaining agreement through the union as her agent, was bound by the same and must be deemed to have left work voluntarily.

The appellate court in *Douglas* rejected the rationale of the trial court, reversed the judgment ordering the issuance of mandate, and upheld the awarding of unemployment benefits. It pointed out that the binding effect on the employee-claimant of the collective bargaining agreement (the core of the trial court's decision) was not involved, but only the separate and different question as to whether such claimant, upon taking a pregnancy leave of absence as required by the agreement, was thereafter entitled to benefits. The same situation exists in the instant case. After reviewing two New Jersey cases (*Campbell Soup Co.* v. *Board of Review etc. Dept. of Labor & Industry* (1953) 13 N.J. 431 [100 A.2d 287] and *Myerson* v. *Board of Review etc. Dept. of Labor & Industry* (1957) 43 N.J. Super. 196 [128 A.2d 15]) and two Pennsylvania cases (*Warner Co.* v. *Unemployment Comp. Board of Review* (1959) 396 Pa. 545 [153 A.2d 906] and

---

retirement provisions of a collective bargaining agreement to which the employer is a party, shall not be deemed to have left his work without good cause.''

[12]Counsel for the parties advise us, and our reasearch confirms, that *Douglas* is the only reported California decision dealing with the issue. A hearing in the Supreme Court was denied.

*Smith* v. *Unemployment Comp. Board of Review* (1959) 396
Pa. 557 [154 A.2d 492]), in all of which the provisions in the
collective bargaining agreements for termination of employ-
ment at a specified age or at a specified time of pregnancy
had been initially proposed by the employers and in which it
had been held that the termination should not be deemed
voluntary merely because its possibility was a binding condi-
tion of employment, the court stated: "We are convinced
that the New Jersey and Pennsylvania cases are soundly
founded and that the doctrine so clearly set forth therein
should be followed in this state." (*Douglas Aircraft Co.* v.
*California Unemp. Ins. Appeals Board, supra,* 180 Cal.App.2d
636, 645.)

In essence, the holding in *Douglas,* is a synthesis of the
principles found in the above four cases from New Jersey
and Pennsylvania: Despite the fact that the possibility of
termination of employment has been indirectly agreed to by
the employee in advance, whether he left his work involun-
tarily or voluntarily depends on whether he was willing and
able to work at the time of separation or, on the other hand,
personally chose and intended to quit. This fundamental
philosophy of *Douglas* is gleaned from the following excerpts
of the above four cases, quoted either entirely or in part by
that court:

From *Warner Co.* v. *Unemployment Comp. Board of Re-
view, supra,* 153 A.2d 906, 909-910: "[T]he collective bar-
gaining agreement should not control in determining the eli-
gibility of a retired employee for unemployment compen-
sation; *rather, the factual matrix at the time of separation
should govern.* . . . Viewed in this light, the questions here
become simply (1) did Gianfelice cease working voluntarily
as a matter of fact, and (2) was Gianfelice available for
work thereafter? (Original italics.) (*Douglas Aircraft Co.*
v. *California Unemp. Ins. Appeals Board, supra,* 180 Cal.
App.2d at p. 644, in part.)

From *Smith* v. *Unemployment Comp. Board of Review,
supra,* 154 A.2d 492, 493: "The appellant was willing and
able to work; and when her employment was discontinued, it
was against her will. Therefore, she did not 'voluntarily
leave' work as far as her state-granted employment benefits
are concerned." (180 Cal.App.2d at p. 644.)

From the leading case of *Campbell Soup Co.* v. *Board of
Review etc. Dept. of Labor & Industry, supra,* 100 A.2d 287,

289, authored by Justice Brennan: ''If the inquiry is isolated to the time of termination, plainly none of the claimants left voluntarily in the sense that on his own he willed and intended at the time to leave his job. . . . The Legislature plainly intended that the reach of the subsection [penalizing voluntary quits without good cause] was to be limited to separations where the decision whether to go or to stay lay at the time with the worker alone and, even then, to bar him only if he left his work without good cause. The claimants here did not choose of their own volition to leave the employ . . . when they were separated. They left because they had no alternative but to submit to the employer's retirement policy, however that policy as presently constituted was originated. Their leaving in compliance with the policy was therefore involuntary for the purposes of the statute.'' (180 Cal.App.2d at p. 645 in part.)

Finally, from *Myerson* v. *Board of Review etc. Dept. of Labor & Industry, supra,* 128 A.2d 15, 17: ''It must be remembered that in reality the unemployment was not voluntary on the part of the particular claimants. . . . [T]here is a 'general public interest' [citation] in the distress caused by unemployment, which induces the law to allow benefits even though the unemployment comes about through the medium of a union contract. . . . Unemployment compensation is not to be denied persons merely because the employer or the collective bargaining agreement designates a period of unemployment as a leave of absence. . . . Hence the fact that Mrs. Myerson here was given a leave of absence, with seniority rights and other privileges protected, is not determinative of the case.'' (180 Cal.App.2d at p. 645 in part.)

Petitioners contend that *Douglas* was decided on a different rationale, that its allegedly true doctrine has been incorrectly applied by the Board and the trial court and that a proper evaluation of this precedent calls for a reversal of the instant case. In short, petitioners rely on *Douglas* but claim that its holding is other than what we have said. They argue that it proceeds along two lines of reasoning and imparts two ''lessons'' ignored by the trial court. On these two bases petitioners construct two arguments for reversal.

The gist of the first argument is this: The provisions of the collective bargaining agreement in *Douglas,* requiring pregnancy leaves of absence were initially proposed by the *employer*. The court, determining that they were in effect ex-

pressions of *company* policy, properly held that leaving work pursuant thereto was not *voluntary* on the employee's part, since it would not have been considered voluntary *before* the provisions were incorporated in the collective bargaining agreement. Therefore when the provisions are in reality the expression of the unions' and therefore the employees' policy (as petitioners claim here), the leaving of work pursuant thereto having been considered voluntary *before* such provisions were incorporated into any collective bargaining agreements, must be considered voluntary *after* such incorporation. As petitioners stated at oral argument, the court must look behind the agreement. It is urged that if this is done in the instant case, the only logical conclusion is that the leaving of work was voluntary.

The second point, which petitioners claim is the "basic lesson" of *Douglas,* is this: since existing statutory rights to unemployment benefits may not be waived by private agreement or the action of parties to a collective bargaining agreement, eligibility for benefits cannot be created by such an agreement where such eligibility would not otherwise exist. As petitioners stated their position at oral argument, the contracting parties cannot change the situation by their own conduct.

We find no merit in these arguments nor any support for petitioners' interpretation of *Douglas* which underlies them. As we have said, *Douglas* holds that whether an employee leaves work voluntarily depends on whether he ceased working voluntarily as a matter of fact at the time he quit. Although his employment is terminated pursuant to a collective bargaining agreement, he is not bound thereby to the extent that he has agreed to the termination and has thus quit voluntarily. That factor is unimportant. (*Campbell Soup Co.* v. *Board of Review etc. Dept. of Labor & Industry, supra,* 100 A.2d 287, 289; *Myerson* v. *Board of Review etc. Dept. of Labor & Industry, supra,* 128 A.2d 15, 17.) The agreement does not control; "*rather the factual matrix at the time of separation should govern.*" (*Warner Co.* v. *Unemployment Comp. Board of Review, supra,* 153 A.2d 906, 909.) The approval of and reliance upon these principles in *Douglas* underscore the court's thesis that the controlling test of benefit eligibility is the claimant's actual voluntariness at the time he quits. Eligibility is determined by this factual test alone and does not depend on the collective bargaining agreement

which is immaterial or upon whether the provisions thereof requiring termination had their genesis in an employer or a union rule. In *Douglas,* the claimant was eligible because at the time she quit she did not as a matter of fact desire to do so. This was the sum and substance of the decision and we can find nothing in the opinion indicating that it rested on the premise that the requirement of the collective bargaining agreement that the employee quit originated in a rule established or proposed by the employer.

Petitioners ignore the real significance of *Douglas.* The opinion in that case represents a choice on the court's part between two conflicting lines of authorities dealing with the question of the employee's voluntariness where he leaves work as required by a collective bargaining agreement. (See Annotation in 90 A.L.R.2d 835; *Ball Brothers Co.* v. *Review Board of Indiana Emp. Security Div.* (1963) 135 Ind. App. 68 [189 N.E.2d 429, 430-431].) Essentially this division has been made on a principle of agency. One line of authority is represented by *Bergseth* v. *Zinsmaster Baking Co.* (1958) 252 Minn. 63 [89 N.W.2d 172] (compulsory retirement); *Anson* v. *Fisher Amusement Corp.* (1958) 254 Minn. 93 [93 N.W.2d 815, 819] (union rules requiring members with junior status to leave to permit members with senior status to take their places); *Kentucky Unemp. Ins. Com.* v. *Reynolds Metals Co.* (Ky. App. 1962) 360 S.W.2d 746; and by *Ball Brothers Co., supra*; see also *Lamont* v. *Director of Division of Employment Security* (1958) 337 Mass. 328 [149 N.E.2d 372] (compulsory retirement under former statute).) Basically these cases hold to the principle that the employees are bound by the acts of their union which represented them as their agent in entering into the collective bargaining agreement. The second line of authority is represented by the *Campbell Soup* and *Myerson* cases from New Jersey and the *Warner* and *Smith* cases from Pennsylvania. Basically these cases hold that the collective bargaining agreement should not be determinative of the employee's eligibility for benefits but the facts at the time he leaves work should govern. These cases withhold application of an agency principle in favor of a liberal interpretation of the statutes providing for such benefits. As the court in *Ball Brothers Co., supra,* summarizes it, "the competing analogies are the desire not to impair the obligations of contracts versus a liberal interpretation of unemployment compensation acts and a desire to protect em-

ployees because courts believe these employees are not voluntarily retiring regardless of the provisions of the collective bargaining agreement." (189 N.E.2d at p. 431.)

The court in *Ball Brothers Co.* joined the first line of authorities believing "that the binding effect of contracts should not be vitiated." (*Ball Brothers Co.* v. *Review Board of Indiana Emp. Security Div., supra,* 189 N.E.2d at p. 431.) This was the conclusion of the *trial* court in *Douglas* and the position taken by the dissenting justice on appeal. The majority in *Douglas,* however, clearly joined the second line of authorities mentioned above. This is apparent from its reliance on such cases, its rejection of the *Bergseth* case and related cases, and its reversal of the trial court. Thus while recognizing "that the provisions of such a collective bargaining agreement are binding on an employee who is a member of the union as well as on the employer" (180 Cal.App.2d at p. 646), *Douglas* concluded that the employee nevertheless did not leave work voluntarily when he left solely because of such agreement but that his voluntariness depended on the facts at the time he left.

We have concluded the question of voluntariness in the instant matter should be resolved by such principles. Applying them here, we are satisfied that the seamen involved should not be deemed to have left work voluntarily on any theory that they agreed to do so through the Unions as their agent. Nor should we look behind the collective bargaining agreement so as to determine voluntariness in reference to the genesis of the limited tenure provisions. Under *Douglas,* the collective bargaining agreement, though binding between the parties and unchallenged by petitioners, is not determinative of the question whether the seamen left work voluntarily or involuntarily. Although they left pursuant to the agreement and as required by its terms, whether they left voluntarily depends on the "factual matrix at the time of separation." The record shows that the claimants did not in fact personally desire or intend to leave their work but did so solely because of the agreement. We therefore hold that the Board and the trial court properly concluded that they had not left voluntarily and were not disqualified for benefits.

Petitioners contend that under California law the proper test to be applied in determining whether an employee has left his work voluntarily within the meaning of section 1256 is not the "factual matrix" test but the so-called "volitional test" which has been established and developed in the trade

dispute cases. (§ 1262; *Bodinson Mfg. Co.* v. *California Emp. Com., supra,* 17 Cal.2d 321, 327-328; *Matson Terminals, Inc.* v. *California Emp. Com.* (1944) 24 Cal.2d 695, 703-704 [151 P.2d 202]; *W. R. Grace & Co.* v. *California Emp. Com.* (1944) 24 Cal.2d 720, 731-733 [151 P.2d 215]; *Bunny's Waffle Shop, Inc.* v. *California Emp. Com.* (1944) 24 Cal.2d 735, 739-742 [151 P.2d 224]; *McKinley* v. *California Emp. etc. Com.* (1949) 34 Cal.2d 239, 242-245 [209 P.2d 602]; *Gardner* v. *State of California* (1959) 53 Cal.2d 23, 27 [346 P.2d 193]; *Ruberoid Co.* v. *California Unemp. Ins. Appeals Board* (1963) 59 Cal.2d 73, 77 [27 Cal.Rptr. 878, 378 P.2d 102]; *Chrysler Corp.* v. *California Emp. etc. Com.* (1953) 116 Cal.App.2d 8, 15-18 [253 P.2d 68]; *Chrysler Corp.* v. *California Unemp. Ins. Appeals Board* (1962) 199 Cal. App.2d 683, 693 [18 Cal.Rptr. 843].) Asserting that the latter test is based on "an evaluation of economic realities and the dynamics of the interplay of pressure and counterpressure applied by labor and management," they urge that it be applied in the instant case "to unemployment arising from the incorporation of the union shipping rules into a collective bargaining agreement." The purpose and objective of the argument are clear—to go behind the collective bargaining agreement and probe the background of its limited tenure provisions.

Section 1256 which is the focal point of controversy here[13] was in no way involved in the trade dispute cases. Those cases centered upon section 1262 which provides: "An individual is not eligible for unemployment compensation benefits, and no such benefits shall be payable to him, if he left his work because of a trade dispute. Such individual shall remain ineligible for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed."

It is manifest that the word "voluntary" does not appear in section 1262. Nevertheless, according to the interpretation placed on this section and its predecessor statute, "it was intended to disqualify those workers who *voluntarily* leave their work because of a trade dispute" (italics added; *Bodinson Mfg. Co.* v. *California Emp. Com., supra,* 17 Cal.2d 321, 328; *Matson Terminals, Inc.* v. *California Emp. Com.,*

[13]See fn. 11, *ante.*

*supra,* 24 Cal.2d 695, 703) and "the right to benefits under . . . the statute was said to depend upon whether the worker left his job of his own free will or was forced to do so because of the acts of others." (*McKinley* v. *California Emp. etc. Com., supra,* 34 Cal.2d 239, 243; *Chrysler Corp.* v. *California Unemp. Ins. Appeals Board, supra,* 199 Cal. App.2d 683, 687.) In *Chrysler Corp.* v. *California Emp. etc. Com., supra,* 116 Cal.App.2d 8, 15, the court said: "This 'volitional' test postulates the need for an inquiry into the dynamics of the circumstances which have created the unemployment, the criteria for denial or awarding of benefits being the personal responsibility of the claimant for his unemployment in the former case [citation], or the fault of the employer in the latter case. [Citation.]"

Dealing with section 1262 in *Ruberoid Co.* v. *California Unemp. Ins. Appeals Board, supra,* 59 Cal.2d 73, 77, Justice Tobriner wrote for a unanimous court as follows: "We have recognized that this section expresses the two-pronged and balanced purpose of the state to maintain its neutrality in trade disputes. . . . We have construed the section in light of the whole legislative design of relieving workers from the ill effects of unemployment which they have neither willed nor caused. Thus we have said that the disqualification of the section must rest upon two elements: the worker must voluntarily leave or remain away from his employment and the worker must leave or remain away from his employment because of a trade dispute. As we shall describe in more detail, the first prerequisite involves a volitional test and the second, a causational test."

To say that the trade dispute cases involve a different section of the Unemployment Insurance Code (section 1262) from that involved in the instant case (section 1256) is only to state an obvious fact. Of greater significance is the consideration that section 1262 in the light of decisional interpretation has a different purpose, objective and scope of operation. It disqualifies a claimant for benefits "if he left his work *because* of a trade *dispute.*" (Italics added.) This subserves the established policy of neutrality in trade disputes by preventing the benefits from being used to aid either party to the dispute. (*Ruberoid Co.* v. *California Unemp. Ins. Appeals Board, supra,* 59 Cal.2d 73, 77; *Matson Terminals, Inc.* v. *California Emp. Com., supra,* 24 Cal.2d 695, 707.) To determine whether the claimant was responsible for his own

unemployment and therefore should be denied the aid of benefits or was forced to leave his work because of the acts of others and therefore was still entitled to benefits, it was necessary under the volitional test to inquire into the economic realities of the circumstances resulting in the unemployment. (*Chrysler Corp.* v. *California Unemp. Ins. Appeals Board, supra,* 199 Cal.App.2d 683, 687; *Chrysler Corp.* v. *California Emp. etc. Com., supra,* 116 Cal.App.2d 8, 15.)

Section 1262 by its very language is operative in a setting of *dispute.* In the light of the realities of the situation, of necessity "the form of the cessation of employment is not controlling and the determinative factor is the volitional cause of the work stoppage." (*McKinley* v. *California Emp. etc. Com., supra,* 34 Cal.2d 239, 243.) The crucial question is whether the claimants are out of work "because of their own conduct and that of their authorized unions." (*Gardner* v. *State of California, supra,* 53 Cal.2d 23, 27.) In the trade dispute cases the problem is to resolve the mutual accusations of employer and employee as to the responsibility for the latter's unemployment in the course of the dispute. The volitional test is a formula for arriving at a just assessment of such responsibility.

The above test fashioned by the courts to implement section 1262 is simply not applicable to situations like the one before us. There is here no trade dispute between employer and employee; nor any need to determine responsibility for unemployment ensuing during the controversy; nor any compulsion to preserve neutrality in the course of doing so. Indeed the main issue arises not under section 1262 but under section 1256, not from a trade *dispute* but from a trade *agreement.* The limited tenure provisions of the collective bargaining agreement which have given rise to the present problem were adopted as the working policy of both contracting parties. It is not necessary to determine as between employer and employee which party is responsible for the rules requiring termination of employment. All parties accepted them. In any event, an attempt to analyze the complex "pressures of the collective bargaining process" (*Warner Co.* v. *Unemployment Comp. Board of Review, supra,* 153 A.2d 906, 909) and appraise the give and take endemic therein, would undoubtedly produce no clearcut answer. (See *Warner Co.* v. *Unemployment Comp. Board of Review, supra.*)

We conclude that the "volitional test" fashioned for

trade disputes arising under section 1262 is by its nature and purpose inapplicable to questions of voluntariness arising under section 1256 in reference to limited tenure provisions of collective bargaining agreements, that a proper determination of voluntariness in the latter situation under the rule of the *Douglas* case requires no inquiry behind the agreement into its antecedent circumstances, and that the application of the "factual matrix" test in such instances to determine voluntariness under section 1256 does not conflict with the law of this state.

The judgment is affirmed.

Molinari, J., and Sims, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied September 29, 1965.